The RIPON SOCIETY, INC., et al., Appellants,

v.

NATIONAL REPUBLICAN PARTY et al.

The RIPON SOCIETY, INC., et al.,

v.

NATIONAL REPUBLICAN PARTY et al., Appellants.

Nos. 74–1337, 74–1358.

United States Court of Appeals, District of Columbia Circuit.

Reargued en banc May 30, 1975.

Decided Sept. 30, 1975.

Certiorari Denied Feb. 23, 1976.

See 96 S.Ct. 1147, 1148.

---

568

On Rehearing en banc.

Robert M. Pennoyer, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom George M. Coburn, Washington, D. C., was on the brief, for appellants in No. 74–1337 and appellees in No. 74–1358.

William C. Cramer and Erwin N. Griswold, Washington, D. C., with whom Benton L. Becker, Washington, D. C., was on the brief, for appellants in No. 74–1358 and appellees in No. 74–1337.

Sheldon S. Cohen and Julie Noel Gilbert, Washington, D. C., filed a brief on behalf of The Democratic National Committee as amicus curiae urging reversal.

Before BAZELON, Chief Judge, DANAHER, Senior Circuit Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges sitting en banc.

Opinion for the court filed by Circuit Judge McGOWAN.

Opinion filed by Circuit Judge MacKINNON, concurring except with respect to the standing of Ripon Society.

Opinion filed by Senior Circuit Judge DANAHER, concurring in the result.

Opinion filed by Circuit Judge TAMM, with whom Circuit Judge ROBB joins, concurring in the result.

Opinion filed by Circuit Judge WILKEY, with whom Senior Circuit Judge DANAHER joins, concurring in result only.

Dissenting opinion filed by Chief Judge BAZELON.

McGOWAN, Circuit Judge:

For the third time in four years, this court confronts a challenge from within one of the two major national political parties to the formula fixed by it for the allocation of delegates to its quadrennial national convention. In the earlier instances, divisions of this court held such challenges to be unavailing for want of merit. Today, for the reasons set forth hereinafter, the court *en banc* reaches the same result with respect to the present appeal.

I

The subject of the appeal is the delegate allocation formula adopted by the National Republican Party for its 1976 convention. The Ripon Society and nine individual plaintiffs[1] have secured the judgment of the District Court that parts of that formula are unconstitutional. 369 F.Supp. 368 (D.D.C.1974). The ruling of the District Court is not the first one made in plaintiffs' favor. In 1971 they sued to enjoin the use of a similar allocation formula at the 1972 Republican National Convention. Partial relief was granted in April of 1972. 343 F.Supp. 168 (D.D.C.1972). That judgment was stayed by Justice Rehnquist, 409 U.S. 1222, 93 S.Ct. 1475 (1972), and the convention was conducted as planned. Thereafter the appeal from the District Court was dismissed, and the complaint amended to state the present challenge to the 1976 formula.

That formula was adopted, on a vote of 910 to 434, by the delegates to the 1972 convention. It provides as follows: 1,605 delegates, or 72 percent of the total, are allocated according to the states' electoral college votes, each state to receive three delegates per presidential elector; 312 delegates, or 14 percent, are awarded as "victory bonuses" to states voting for the Republican candidate in the last presidential election, each such state to receive a number of additional delegates equal to 60 percent of its electoral college vote, or 20 percent of its electoral college-based delegation (the "proportional victory bonus"); 245 delegates, or 11 percent, are divided equally among the states that voted for the last Republican presidential candidate, each such state to receive five delegates on this basis (the "uniform victory bonus");[2] 50 delegates, or 2 percent, are

---

1. The defendants in this suit are the National Republican Party and the Republican National Committee. Since both the plaintiffs and the defendants in the District Court are appellants here, we will for clarity's sake refer to them by the former titles.

2. The formula actually awards 4½ delegates as a uniform bonus for victory in the last presidential election. It also provides, however, that the number is to be added to the proportional bonus of 60 percent of electoral college vote, and resulting fractions increased to next

awarded to the states for Republican election successes at the state level, one such delegate for each Republican governor, senator, or majority of United States Representatives which the state elects in 1972 or a succeeding year prior to the 1976 convention (this bonus will be considered part of the "uniform victory bonus");[3] and 30 delegates, or 1 percent, are divided among the District of Columbia (14), Puerto Rico (8), Guam and the Virgin Islands (4 each).

Declaratory and injunctive relief was sought on the ground that the formula as a whole, and in particular its various victory bonus features, denied plaintiffs equal protection of the laws. Plaintiffs proposed that the Republican National Committee be permitted to fashion a new formula[4] subject to the constraints that (1) a "substantial" number of delegates be allocated according to the Republican vote in one or more recent elections, (2) the remaining delegates be apportioned on the basis of population or electoral college vote, (3) the District of Columbia be treated for allocation purposes as a state, and (4) the territories receive a number of delegates no greater than what they would be entitled to on a population basis.

The district judge granted relief only in part. Ruling on cross-motions for summary judgment, he forbade the use of uniform victory bonuses, but upheld the formula in other respects. 369 F.Supp. at 376. Plaintiffs have appealed the denial of additional relief; defendants have appealed the granting of any relief at all.

## II

Defendants assert that there are preliminary issues which, if rightly decided, preclude our reaching the merits. These involve the concepts, respectively, of standing to sue, state action, and justiciability. In this part of the opinion, we address these issues in succession.

### A. *Standing.*

The standing requirement serves many purposes, including that of seeing to it that claims are prosecuted to binding resolution on the merits only by those with a sufficient interest to assure an informed and effective presentation. We would not wish to rule one way or the other in this case without satisfying ourselves that that requirement had been met.[5]

---

whole number. J.A. 153a. Thus, most states will in effect receive 5 uniform victory bonus votes, and may also receive a proportional bonus greater than the 20 percent figure mentioned in text. For example, a qualifying state having only 3 electoral college votes, and therefore a basic delegation of 9, will receive 7 extra delegates (60% × 3 + 4.5 = 6.3), in effect a uniform bonus of 5 delegates, and a proportional bonus of 2 delegates or 22 percent.

3. Bonus votes awarded on this basis are limited to two for the election of senators, one for the election of governors, and one for the election of House of Representatives delegation majorities. The 50 and 2 percent figures are based on 1972 successes; the record contains no figures for later elections.

4. Foreseeing this litigation, the delegates to the 1972 convention authorized the National Committee to adopt a new formula should the one contained in Rule 30 be invalidated. Such a new formula must be adopted prior to October 31, 1975. *See* Rule 30, J.A. 153a.

5. Objection has been made not only to the standing of plaintiffs to sue, but also to the capacity of the National Republican Party to be sued. It is claimed that no such national party is formally constituted under any state or federal law, and that the term is merely a collective description of the individual state and territorial Republican Parties. This precise question was resolved against the party in *Georgia v. National Democratic Party,* 145 U.S.App.D.C. 102, 447 F.2d 1271, 1273, n.2, *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971), and we see no reason for a different result here. In the federal courts, whether or not in the state courts, an "unincorporated association . . . may be sued in its common name for the purpose of enforcing . . . against it a substantive right existing under the Constitution or laws of the United States." *Fed.R.Civ.P.* 17(b). Certainly plaintiffs' purpose is to enforce what they conceive to be a substantive constitutional right. We take it that the existence of an unincorporated association bearing the common name "National Republican Party" was found as a fact by the District Court, and we cannot say

We focus first on the individual plaintiffs. Each of the nine is alleged in the supplementary complaint to be a "citizen of the United States, a Republican, a registered and qualified voter of the District of Columbia or of . . . California, Illinois, Indiana, Massachusetts, Minnesota, New Jersey [or] New York." We think that we may fairly take this as an assertion by each plaintiff of an interest in being represented, through the delegation of his or her state or district, at the National Republican Convention.[6] We see no reason to differentiate, for purposes of the standing requirement, between that interest, and the interest of one seeking representation in a state or national legislature. There is of course no doubt that in the latter context an individual, claiming that his vote is diluted because his representative represents a greater number of constituents than do other representatives in the same assembly, has standing to challenge the constitutionality of the apportionment scheme. *Baker v. Carr,* 369 U.S. 186, 204–208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The only remaining question is whether the claims of malapportionment in this case are in fact made by plaintiffs whose representation would be improved if those claims were to prevail.

There appears to be at least one such plaintiff for each claim. It is argued that the formula as a whole deviates too far (in favor of the less populous states) from proportionality to electoral college representation, to total population, and to the Republican vote in past elections. If so, plaintiffs Halliwell, Silverman, White and Vradenburg, residents of California, New York, Illinois and New Jersey, respectively, clearly stand to benefit.[7] Victory bonuses in

---

this was clear error. We know, either from the record or through judicial notice, that there is commonly understood to be a National Republican Party, that it is commonly referred to, and contributed to, as such, that it meets quadrennially in a national convention, and that at the last such convention it formally declared itself "a nationwide Party," whose "general management" it entrusted to the Republican National Committee "subject to direction from time to time of the National Convention." Rules Adopted by the Republican National Convention Held at Miami Beach, Florida, August 21, 1972; Resolution, Rule 19; J.A. 149a, 151a.

6. Plaintiffs' affidavits reveal that each plays an active role in the Republican Party of his or her state or district. Plaintiff Sasseville has been an alternate delegate to the Minnesota Republican Convention and has held "various official party positions." ·J.A. 123a. Plaintiff Silverman has been "an executive and worker in numerous national state [New York] and local Republican campaigns." J.A. 124a. Plaintiff Sweet was a delegate from New York to the 1968 Republican National Convention. J.A. 125a. Plaintiff Vradenburg has served "on the executive Committee of the Young Republicans." J.A. 127e. Plaintiff White has been a Republican precinct captain and candidate for Alderman in Chicago. J.A. 128a. Plaintiff Allison has been a Republican election official and Representative in the Indiana legislature. J.A. 130a. Plaintiff Halliwell has been a Republican nominee for the California State Senate. J.A. 132a. Plaintiff Behn has been a

member of the Massachusetts Republican Platform Committee and an alternate delegate to the national convention. J.A. 133a. Plaintiff Gillette, a past president of the Ripon Society, has served as finance coordinator for a Republican candidate for nonvoting delegate to Congress for the District of Columbia. J.A. 134a.

7. The States named in text are the first, second, sixth, and tenth most populous states according to the 1970 census. Exhibit B, J.A. 76a. Plaintiffs' brief (at 15) alleges, without contradiction, that

[i]f the 1976 Formula were used, the eight most populous states would be allotted 39.1% of the delegates to the 1976 Convention although they have 42.4% of the Electoral College vote and 48.7% of the population, and cast 48.6% of the Republican Presidential vote in 1972; . . .

A stronger case would have been made had such figures been computed for the individual states of which the named plaintiffs are residents. Though they did not do so in their brief to this court, plaintiffs submitted statistical exhibits to the District Court from which the following figures are easily derived:

| State | % of 1976 Convention Delegates Under Rule 30 | % of 1972 Electoral College Vote | % of 1970 Population | % of 1972 Vote for Republican Nominee |
|---|---|---|---|---|
| California | 7.5 | 8.4 | 9.8 | 9.8 |
| New York | 6 8 | 7.6 | 9.0 | 8.9 |
| Illinois | 4.5 | 4.8 | 5.5 | 5.9 |
| New Jersey | 3.0 | 3.2 | 3.5 | 3 9 |

See Exhibits A & F, J.A. 74a, 75a, 83a, 84a.

general are said to violate the Constitution. If so, there will be a clear benefit to plaintiff Behn, a resident of Massachusetts, the only state which did not cast its electoral vote for the 1972 Republican nominee.[8] To the extent the victory bonuses are opposed only for the form they take, i. e., uniform and electoral college-based, the plaintiffs from California, New York, Illinois, and New Jersey once again have concrete reason to complain. Finally, the District of Columbia and the territories are allegedly over-represented. All plaintiffs other than Gillette are residents of states, and thus have a sufficient stake in the matter.

The standing of the Ripon Society is more doubtful. It describes itself as a "nationwide organization of young business, professional and academic men and women organized to engage the talents and energies of thinking young people in the cause of constructive Republicanism." Its publications are said to provide "a forum for fresh ideas, well-researched proposals and a spirit of criticism within the Republican Party." Its National Executive Committee authorized this action "to ensure fair and constitutional representation at Republican National Conventions."

■ Yet the Society claims no harm to itself,[9] nor even to any interest to which it is particularly dedicated.[10] Certainly there may be harm to some of its members, but a party may not ordinarily assert the rights of others,[11] and the Ripon Society has not made a strong case for being excepted from this rule. It makes no claim that its members are uniquely, or even predominantly, injured.[12] It gives no reason to believe that those members who are adversely affected cannot assert their own rights.[13] It

---

**8.** After the judgment of the District Court and prior to this appeal, plaintiff Behn apparently changed his residence from Massachusetts to North Carolina. Br. Appellants at 9. Whether or not he thereby forfeited his standing to seek an appellate ruling on the victory bonus is of no moment, however, since it appears that standing to challenge the bonuses may also be claimed by plaintiff Gillette, a resident of the District of Columbia. See note 6 supra. Gillette plainly cannot object to the formula as a whole, since he claims that it greatly over-represents the District. However, we think that standing to make the various claims should be judged with reference to each claim individually. A separate claim is that the Constitution requires that the District be treated exactly as the states are. Br. Appellants at 61. If this claim should succeed and the challenge to the victory bonus should fail, Gillette will plainly be the worse off, since the District qualifies for no bonus votes.

**9.** Compare Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (possibility that statute prohibiting attendance at private schools could force closing of such schools gave them standing to assert constitutional rights of parents to direct the upbringing of children).

**10.** Compare United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 678–90, 93 S.Ct. 2405, 2411, 37 L.Ed.2d 254 (1973) (student environmental association whose "primary purpose [was] to enhance the human environment for its mem-

bers" had standing to challenge ICC action as violative of National Environmental Policy Act).

**11.** See e. g., Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

**12.** Compare Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 187, 71 S.Ct. 624, 656, 95 L.Ed. 817 (1951) (Jackson, J., concurring) (organization should be permitted to assert members' interests "where the Government has lumped all the members' interests in the organization so that condemnation of one will reach all"). The Supreme Court in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), seemed to espouse the broader principle that "an organization whose members are injured may represent those members in a proceeding for judicial review." However, it denied the Sierra Club standing to challenge the Interior Secretary's grant of permission to develop a National Forest on the ground that the Club had not alleged that any of its members would in fact be adversely affected. Id. at 735, 739, 92 S.Ct. at 1368. Arguably, the Ripon Society meets the latter test by joining with individual plaintiffs who clearly are adversely affected, and who are also members of the Society. Even so, however, the Sierra Club remains distinguishable as an organization whose "special interest" was the protection of the environment.

**13.** Compare NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958) (NAACP could assert members' right to freedom of association since

574

seems, in short, merely to have an Executive Committee whose "spirit of criticism" extends to the allocation formula for convention delegates.

 Whether the standing requirement has been so far relaxed as to be satisfied by this coincidence alone is, however, a question we need not decide in this case. We have concluded that the individual plaintiffs had standing to bring this suit. The purpose of the requirement is to ensure the presence of a jurisdictional case or controversy, and of "that concrete adverseness which sharpens the presentation of issues." [14] We cannot see how the Ripon Society's participation in this case could lessen the controversy, or blur the presentation of issues, or alter the course of the litigation in any way. [15] If the trial judge erred in refusing to strike the Ripon Society as a plaintiff for lack of standing, this error was harmless.

B. *State Action.*

 As their claim is founded entirely on provisions of the United States Constitution which apply only to the federal and state governments, essential to the merits of plaintiffs' case is the proposition that a national party's allocation of convention delegates constitutes "state action." [16] We found such action

in *Georgia v. National Democratic Party, supra* note 5—the first of our prior decisions on delegate allocation. Our reasoning was that since the action of individual state parties in selecting their candidates, and indeed their convention delegates, was state action, it could not be otherwise when those parties acted through their delegates at the national convention. *Id.* at 1274–75. We also concluded that by placing the nominee of the convention on the ballot, the states "adopted this narrowing process as a necessary adjunct of their election procedures," and thus subjected it to constitutional scrutiny. *Id.* at 1275–76. We adhered to our *Georgia* holding in *Bode v. National Democratic Party,* 146 U.S.App. D.C. 373, 452 F.2d 1302, 1304 (1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972). As the question now comes to us a third time, however, its answer is much less clear.

The Supreme Court has in the meantime decided *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), and *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), taking a different, and arguably narrower, view of what constitutes "state action" than is reflected in our *Georgia* decision. [17] The

"[t]o require that it be claimed by the members themselves would result in nullification of the right at the very moment of its assertion").

**14.** *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

**15.** There is no indication that the Ripon Society differs from the individual plaintiffs on any point. There is no relief to which only it would be entitled. We assume, then, that it would support this suit to the same extent even were it to lose its formal status of a plaintiff.

**16.** Plaintiffs rely primarily on the Equal Protection Clause of the Fourteenth Amendment. That provision, the source of the "one man, one vote" rule for state legislatures, *see Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), applies only to the states. *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). Also cited in the supplementary com-

plaint are the Fifth Amendment and Article II, Section 1. J.A. 58a. The Fifth Amendment's Due Process Clause requires that the federal government, like the states, provide equal protection of the laws. *Johnson v. Robinson,* 415 U.S. 361, 364 and n. 4, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). It applies only to the federal government, however, and not to private citizens. *Public Utilities Comm'n v. Pollak,* 343 U.S. 451, 461, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). Article II, Section 1 details the procedure for the election of the President through the electoral college. If it has any force at all beyond its specific commands, it also is confined to the federal government.

**17.** In *Moose Lodge* the exclusion of black guests by a private club possessing a state liquor license was held not to be state action subject to the Fourteenth Amendment's Equal Protection Clause. In *Jackson* the termination of service by a state-regulated public utility

Supreme Court focused in each of those cases on the "nexus between the State and the challenged action" of the ostensibly private entity, rather than on that entity's relationship to the state in general. 419 U.S. at 351, 95 S.Ct. 449. *See also* 407 U.S. at 173, 92 S.Ct. 1965. The "nexus" between the states and the delegate allocation formula is open to question, particularly since the Supreme Court has also now held, in *Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975), that an individual state is without power to interfere with the delegate selection procedures of a national convention.[18]

Nor can we take much comfort from the obvious distinctions between these cases and ours. In *O'Brien v. Brown,* 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972), the Democratic National Party sought review of an order of this court (152 U.S.App.D.C. 157, 469 F.2d 563) that a number of delegates disqualified by the Party's Credentials Committee be seated at its 1972 convention. The Supreme Court *per curiam* stayed our order, professing "grave doubts" as to its propriety.[19] Our finding of state action on the part of the Credentials Committee was specifically questioned. To be sure, *O'Brien* is itself distinguishable as a case not involving the allocation of delegates among the states. Justice Rehnquist at least would apparently not consider this distinction persuasive, since he relied exclusively on *O'Brien* when he stayed the District Court's earlier order in this very case.[20]

If plaintiffs' prospects for success on the state action issue have been somewhat dimmed by the actions of the Supreme Court, they have conceivably been somewhat brightened by those of the Congress. The Federal Election Campaign Act Amendments of 1974, approved on October 15, 1974, provide for federal financing of the 1976 presidential nominating conventions.[21] The national committees of the Republican and Democratic Parties are each to receive two million dollars to defray convention expenses.[22] The presidential primaries, in

was held not to be state action subject to the Fourteenth Amendment's Due Process Clause.

18. *Cousins* was an appeal from the state courts of Illinois, which had commanded the seating at the 1972 Democratic National Convention of a number of Illinois delegates whom that party's Credentials Committee had disqualified. The United States Supreme Court reversed, primarily on First Amendment grounds. We discuss this case more fully below. The Court carefully reserved the question of whether a national party's selection and allocation of delegates constituted state action, presented a justiciable question, or was subject to the principles of the reapportionment decisions. 419 U.S. at 483 n. 4, 95 S.Ct. 541.

Even assuming that our finding of state action in *Georgia* rested not on the power of the states to approve or disapprove the "narrowing process," but merely on their support of its outcome by the placement of the candidate's name on the ballot, *Moose Lodge* and *Jackson* must still give us pause. Both cases rejected claims of state action based on the award to the defendants of a state benefit, which in the case of the power license in *Jackson,* the Court was prepared to assume was a monopoly. *See* 407 U.S. at 177, 92 S.Ct. 1965; 419 U.S. at 351–52, 95 S.Ct. 449.

19. 409 U.S. at 4–5, 92 S.Ct. 2718. The stay was granted three days before the opening of the convention. The Democratic National Party's petition for certiorari, which accompanied its stay application, was not disposed of until after the convention, at which time the case was remanded with directions to dismiss as moot. 409 U.S. at 816, 93 S.Ct. 67, 34 L.Ed.2d 72.

20. *Republican State Central Comm. v. Ripon Society, Inc.,* 409 U.S. 1222, 93 S.Ct. 1475 (1972). The Court in *O'Brien* also gave us reason to question the premise of our first line of reasoning in *Georgia, i. e.,* that the elective processes of individual state parties constituted state action for all purposes. The "White Primary Cases" on which we largely based that premise were distinguished in *O'Brien* as "case[s] in which claims [were] made that injury arises from invidious discrimination based on race in a primary contest within a single State." 409 U.S. at 4 n. 1, 92 S.Ct. at 2720. *See also Cousins v. Wigoda,* 419 U.S. at 493–94, 95 S.Ct. 541 (Rehnquist, J., concurring).

21. Pub.L.No. 93–443, 88 Stat. 1263 (codified in scattered sections of 2, 5, 18, 47 U.S.C. and *Int.Rev.Code* of 1954).

22. *See* Pub.L.No. 93–443, Tit. IV, § 406(a), 88 Stat. 1294, *as codified, Int.Rev.Code* of 1954,

which many of the delegates to those conventions will be elected, are to receive federal support in the form of a partial matching of the funds raised by candidates running in those primaries.[23] The federal government is also to subsidize the general election campaigns of the party nominees to the tune (potentially) of twenty million dollars for each major party candidate.[24]

If the parties' conventions, and their candidates, are to be so far underwritten by the federal government, then perhaps they must share its constitutional obligations. Of course the public financing provisions may never actually be put into effect. The Supreme Court will soon review an *en banc* decision of this court upholding the constitutionality of these public financing provisions.[25] The entire matter is thus in a state of some uncertainty.

Because, as the Supreme Court said in *O'Brien,* the existence of state action is a difficult and "highly important question," because it may well be a very different question when the matter of federal financing is settled, and because it cannot in any case affect the outcome of this appeal, we decline to decide it. As elaborated below, it is clear to us that plaintiffs' case must fail on its merits without regard to whether or not there is state action, a question which we therefore expressly reserve.[26]

§ 9008. For a summary of recently enacted state plans to provide public financing of the nomination and election processes, see *Developments in the Law-Elections,* 88 *Harv.L.Rev.* 1111, 1265–67 (1975). Such public financing by the federal government was first decreed in 1971, but it was not to take effect until the 1976 election. See Pub.L.No. 92–178, Tit. VIII, § 801, 85 Stat. 562, *as codified, Int.Rev.Code* of 1954, §§ 9000–13.

**23.** See Pub.L.No. 93–443, Tit. IV, § 408(c), 88 Stat. 1297, *as codified, Int.Rev.Code* of 1954, §§ 9031–42.

**24.** See Pub.L.No. 93–443, Tit. IV, § 404(a), 88 Stat. 1291, *as codified, Int.Rev.Code* of 1954, § 9004. The candidates of the two major parties are entitled to equal sums not to exceed $20 million which is also the limit on campaign expenditures from whatever source. See Pub.L.No. 93–443, Tit. I, § 101(a), 88 Stat. 1263, *as codified,* 18 U.S.C. § 608(c)(1)(B). Minor party campaigns, and conventions, are to be subsidized proportionally to their vote in the last presidential election. See Pub.L.No. 93–443, Tit. IV, §§ 404(b), 406(a), 88 Stat. 1291, 1294, *as codified, Int.Rev.Code* of 1954, §§ 9004(a)(2), 9008(b)(2). The source of all these grants is to be the Presidential Election Campaign Fund, made up of voluntary contributions from federal taxpayers, who may designate one dollar of their federal tax payments for the purpose. See *Int.Rev.Code* of 1954, §§ 6096, 9006. The parties are to receive pro rata shares of their entitlements if the Campaign Fund is insufficient to fund them fully. See *id.* § 9006(d).

**25.** *Buckley v. Valeo,* 171 U.S.App.D.C. 172, 229–238, 519 F.2d 821, 878–87, *appeal granted,* —— U.S. ——, 96 S.Ct. 32, 46 L.Ed.2d 36, 44 U.S.L.W. 3178 (U.S. Oct. 6, 1975) (No. 75–436).

See also *Buckley v. Valeo,* 401 F.Supp. 1235 (D.D.C.1975) three-judge court), *appeal granted,* —— U.S. ——, 96 S.Ct. 32, 46 L.Ed.2d 36, 44 U.S.L.W. 3178 (U.S. Oct. 6, 1975) (No. 75–437).

**26.** Defendants contend that a finding of state action is necessary not only to plaintiffs' success on the merits, but also to the existence of federal jurisdiction. They assert that the only plausible basis for such jurisdiction is 28 U.S.C. § 1343(3), and that the requirement of that section that the suit be one to redress a constitutional deprivation made "under color of . . . State law," cannot be satisfied unless the adoption of the delegate allocation formula constituted state action. In short, they regard this "state action" question as a jurisdictional one. They are not without support for this view. When § 1343(3) has been invoked in suits against defendants claiming disassociation from the state, the courts have often considered the state action question entirely in terms of whether the defendants' actions were "under color of . . . State law." *See, e. g., James v. Pinnix,* 495 F.2d 206 (5th Cir. 1974); *Ward v. St. Anthony Hospital,* 475 F.2d 671 (10th Cir. 1973); *Chicago Joint Board, Amalgamated Clothing Workers of America v. Chicago Tribune Co.,* 435 F.2d 470 (7th Cir. 1970), *cert. denied,* 402 U.S. 973, 91 S.Ct. 1662, 29 L.Ed.2d 138 (1971); *Powe v. Miles,* 407 F.2d 73 (2d Cir. 1968).

We have considered, but rejected, the possibility of basing jurisdiction on alternative approaches so that we need not confront questions concerning both whether our jurisdiction under § 1343(3) depends on the existence of state action and whether the requisite state action is present in the circumstances of this case. One possibility is that a plaintiff asserting jurisdiction under § 1343(3) need only raise

## C. Justiciability.

We pretermit the question of whether the validity of a national political party's actions in apportioning convention delegates is justiciable in the federal courts. This also was a matter decided in *Georgia,* 447 F.2d at 1276–78, regarded as settled in *Bode,* 452 F.2d at 1305, and subjected to "grave doubts" in *O'Brien,* 409 U.S. at 4–5, 92 S.Ct. 2718. While it is not, like the state action question, one which rests upon shifting statutory ground, it is nonetheless one of obvious difficulty.

*Georgia* and *Bode* were decided in the wake of *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), two decisions which seemed to drain the "political question" doctrine of much of its vitality.[27] The Court in the former case declared that "the mere fact that the suit seeks protection of a political right does not mean it presents a political question." 369 U.S. at 209, 82 S.Ct. at 706. Such questions were said to arise from "the relationship between the judiciary and the coordinate branches of the Federal Government." *Id.* at 210, 82 S.Ct. at 706. Arguably the question now before us is nonjusticiable under *Baker* because of a "lack of judicially discoverable and manageable standards for resolving

it." *Id.* at 217, 82 S.Ct. at 710. Yet the *Baker* Court considered "manageable" for legislative apportionment schemes a standard quite similar to the one we apply below to delegate apportionment schemes. It held that legislative schemes were to be struck down only if they "reflect . . . *no* policy but simply arbitrary and capricious action." *Id.* at 226, 82 S.Ct. at 715.

*Powell* appeared to curtail the "political question" doctrine even further. Faced with what might have been thought the classically "political question" of whether the House of Representatives—a coordinate branch—had properly excluded one of its members, the Court found the question justiciable. Significantly for our case, it rested that finding in part on the involvement of the right to choose one's own representatives, which compelled it to "resolve any ambiguity in favor of a narrow construction of the scope of Congress' power." 395 U.S. at 547, 89 S.Ct. at 1977. In seemingly sharp contrast with this approach, we have been more recently admonished by the Court to exercise "great caution" before we "interject [ourselves] into the deliberative processes of a national convention, . . . involving as they do, relationships of great delicacy that are essentially political in nature." *O'Brien v. Brown,* 409·U.S. at 4, 92 S.Ct. at 2720.

a substantial question as to the existence of state action in order to gain access to the federal courts. *Cf. Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (jurisdiction exists under § 1331 unless the constitutional claim is "frivolous"); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (finding of no state action cast in terms of dismissal on merits). Another alternative is to base jurisdiction on § 1331. No amount in controversy has been alleged herein, but conceivably such an allegation is unnecessary where personal civil rights are sought to be vindicated. *See Cortright v. Resor,* 325 F.Supp. 797 (S.D.N.Y.), *rev'd,* 447 F.2d 246 (2d Cir. 1971). *But see Gomez v. Wilson,* 155 U.S.App.D.C. 242, 477 F.2d 411, 420–21 n. 56 (1973).

We are disinclined, however, to rest on either of these alternative approaches given the scant or nonexistent attention that the parties have addressed to them (§ 1331 was not cited

by the plaintiffs). We will assume, rather than hold, that our jurisdiction under § 1343(3) depends on the existence of state action. Consequently, since we are pretermitting the question of whether or not there is state action in this case, we reserve also the question of jurisdiction under § 1343(3). *See* note 28 *infra,* and cases cited.

27. A question may be nonjusticiable for reasons other than its being a "political question." The justiciability issue is the broader one of whether the particular question is "capable of resolution through the judicial process," as it may not be purely because it does not arise in a "case or controversy." *Flast v. Cohen,* 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968). We have resolved our doubts on that score under the heading of "standing," *supra,* and confine ourselves here to the "political question" doctrine of nonjusticiability.

In declining to decide the question of justiciability, we note its close relationship to the question we do decide, that is to say, the merits of the constitutional claim. Defendants' arguments for nonjusticiability are that the "manageable" one person, one vote standard is inapplicable, and that without it a court has no basis for evaluating the political judgments that parties make in choosing among alternative delegate allocation schemes. Our view is not so different. We agree that a strict one person, one vote standard is inapplicable, and, since we consider the party's choice among allocation schemes to be as much an exercise as an infringement of constitutional rights, we cannot say that it offends the Constitution. What we decline to do, however, is to take the more drastic step of holding that we would never be competent to reach a contrary conclusion.[28]

## III

Having assumed *arguendo* that defendants are subject to justiciable constitutional limitations, we confront the question of whether those limitations have been exceeded in this case. Our discussion falls into two parts, the first dealing with what in general the Constitution requires in the allocation of delegates to a national political convention,

and the second inquiring as to whether this particular formula satisfies those requirements.

### A. *Applicability of One Person, One Vote.*

As noted above, plaintiffs rely primarily on the constitutional guarantee of equal protection. They analogize the Republican National Convention to the state legislatures in which that guarantee has been held to require representation on a "one man, one vote" basis. Plaintiffs propose that the constituency whose members are each to have "one vote" be either the entire population of a state, or that part of it that voted Republican in one or more past elections. Their entire argument is couched in terms of the challenged formula's deviations from proportionality to those constituencies. Although they would apparently accept some such deviations, they would set as an outer limit the deviations present in the electoral college. The disproportionality introduced by the victory bonus system they do not consider justifiable. In short, they argue that, whichever of its permissible constituencies the Republican Party chooses to represent at a national convention, it must represent those constituents as a legislature would, and give them mathematically equal representation or have a

---

**28.** We recognize that "state action" and "justiciability" are often regarded as threshold issues. We see nothing illogical about passing over them, however, and we certainly do not lack authority for doing so. In *United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), the Court of Claims had awarded back pay to two ex-servicemen on the ground that their constitutional rights had been violated in the courts-martial which preceded their military discharges. Certiorari was granted "because of the importance of the question concerning the jurisdiction of the Court of Claims to review judgments of courts-martial." *Id.* at 349, 89 S.Ct. at 530. After brief discussion of that question, however, the Court expressly declined to decide it, since "even if we assume, arguendo, that a collateral attack on a court-martial judgment may be made in the Court of Claims through a back-pay suit alleging a 'constitutional' defect

in the military decision, these present cases on their facts do not rise to that level." *Id.* at 351–52, 89 S.Ct. at 53. The Court similarly declined to rule on a challenge to jurisdiction preferring a denial of relief on the merits, in *Secretary of the Navy v. Avrech*, 418 U.S. 676, 677–78, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974), and in *Schneckloth v. Bustamonte*, 412 U.S. 218, 249 and n. 38, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *See also Public Utilities Comm'n. v. Pollak*, 343 U.S. 451, 462–63, 72 S.Ct. 813, 96 L.Ed. 1068 (1952) (Court proceeds to merits of constitutional claim, "assuming" but apparently not deciding that action of regulated transit company constituted "state action"); *Irish v. Democratic Farmer Labor Party of Minnesota*, 287 F.Supp. 794 (D.Minn.), *aff'd*, 399 F.2d 119 (8th Cir. 1968) (relief denied without decision of whether state party's election of delegates constituted "state action").

compelling reason not to. That is the essence of the claim, and also its essential fallacy.[29]

The fact that the conduct of a national political convention may be subject to the Equal Protection Clause does not in itself establish the applicability of the one person, one vote rule. Manifestly, a given constitutional command may not require of one part of the state what it requires of another. The army and the park commissioner are not equally constrained by the First Amendment; the President is not subject to the same restraints in making appointments as Congress is in passing legislation. And indeed it is clear that the Equal Protection Clause does not impose the same one person, one vote rule upon all elected and decision-making bodies, even if they are formally and indisputably organs of the state.

That rule is not, for example, applicable to the election of state judges. The plaintiffs in *Wells v. Edwards*, 347 F.Supp. 453 (M.D.La.1972), challenged the federal constitutionality of the provisions in the Louisiana Constitution for the election of the justices of that state's supreme court from judicial districts of unequal population. It was held that "the rationale behind the one-man, one-vote principle, which evolved out of efforts to preserve a truly representative form of government, is simply not relevant to the makeup of the judiciary." *Id.* at 455. The Supreme Court affirmed. 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973) (memorandum).[30]

**29.** The Supreme Court has not ruled on the applicability of one person, one vote to the selection and apportionment of delegates to national political conventions. *See Cousins v. Wigoda*, 419 U.S. 477, 483 n. 4, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975), note 18 *supra*; *Gray v. Sanders*, 372 U.S. 368, 378 n. 10, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), note 65 *infra*. The lower courts have divided on the point. One person, one vote was found inapplicable in *Irish v. Democratic-Farmer-Labor Party of Minnesota*, 399 F.2d 119 (8th Cir.), aff'g, 287 F.Supp. 794 (D.Minn.1968) (party may select national convention delegates through malapportioned state convention system), and apparently also in *Smith v. State Exec. Comm.*, 288 F.Supp. 371 (N.D.Ga.1968) (equal protection satisfied by election of national convention delegates in "open convention"). Two District Courts have squarely held to the contrary. *Doty v. Montana State Democratic Central Comm.*, 333 F.Supp. 49 (D.Mont.1971) (party may not select national convention delegates through malapportioned state convention system); *Maxey v. Washington State Democratic Comm.*, 319 F.Supp. 673 (W.D.Wash.1970) (same). Several courts have distinguished between "internal" party affairs and party nominations, holding the one person, one vote rule applicable only to the latter. *Seergy v. Kings County Republican County Comm.*, 459 F.2d 308 (2d Cir. 1972) (county committeemen may be elected from unequal districts, but when nominating functions are performed malapportionment must be corrected by weighting of members' votes); *Lynch v. Torquato*, 343 F.2d 370 (3d Cir. 1965) (one person, one vote inapplicable to selection of party's county committees); *Dahl v. Republican State Comm.*, 319 F.Supp. 682 (W.D.Wash.1970) (holding of *Maxey, supra*, inapplicable to selection of party's state committee). In *Redfearn v. Del. Republican State Comm.*, 502 F.2d 1123 (3d Cir. 1974), the District Court had held the one person, one vote rule applicable to the party's state convention. The Third Circuit was apparently willing to assume that if the conduct of the convention were "state action," one person, one vote would be required. Troubled by the resulting interference with "the highly relevant associational rights of the Party," however, it remanded the case with directions to the District Court to consider whether the "state action" should not be removed by invalidation of the statute which implicated the state in the party's nominating process.

**30.** *See also Holshouser v. Scott*, 335 F.Supp. 928, 933 (M.D.N.C.1971), aff'd, 409 U.S. 807, 93 S.Ct. 43, 34 L.Ed.2d 68 (1972) ("showing of an arbitrary and capricious or invidious action or distinctions between citizens and voters would be required" to invalidate scheme of judicial nomination by unequal districts); *Stokes v. Fortson*, 234 F.Supp. 575, 577 (N.D. Ga.1964) ("Manifestly, judges and prosecutors are not representatives in the same sense as are legislators or the executive. Their function is to administer the law, not to espouse the cause of a particular constituency."). *Cf. Buchanan v. Gilligan*, 349 F.Supp. 569, 571 (N.D. Ohio 1972); *N. Y. State Ass'n of Trial Lawyers v. Rockefeller*, 267 F.Supp. 148, 153 (S.D.N.Y. 1967); *Buchanan v. Rhodes*, 249 F.Supp. 860 (N.D.Ohio), appeal dismissed, 385 U.S. 3, 87 S.Ct. 33, 17 L.Ed.2d 3 (1966) (all rejecting equal protection challenges to unequal distribution of local district judgeships).

At least one federal district court and four state supreme courts have similarly held that the one person, one vote principle is inapplicable to state constitutional conventions, which "can only make proposals which can have no effect unless . . . ratified in another election [with] every vote given the same weight." *Driskell v. Edwards*, 374 F.Supp. 1, 3 (W.D.La.), *vacated*, 419 U.S. 812, 95 S.Ct. 26, 42 L.Ed.2d 38 (1974),[31] quoting from *West v. Carr*, 212 Tenn. 367, 370 S.W.2d 469, 474 (1963), *cert. denied*, 378 U.S. 557, 84 S.Ct. 1908, 12 L.Ed.2d 1034 (1964). *Accord, Bates v. Edwards*, 294 So.2d 532, 534 (La.1974); *Stander v. Kelley*, 433 Pa. 406, 250 A.2d 474, 481, *cert. denied sub nom. Lindsay v. Kelley*, 395 U.S. 827, 89 S.Ct. 2130, 23 L.Ed.2d 738 (1969); *Livingston v. Ogilvie*, 43 Ill.2d 9, 250 N.E.2d 138, 145–46 (1969).

We know also that the one person, one vote requirement, though generally applicable to local as well as state and federal assemblies,[32] does not apply to certain "special purpose" assemblies whose decisions "disproportionately affect different groups." *Salyer Land Co. v. Tulare Lake Basin Water Storage District*, 410 U.S. 719, 727, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973). Though it had required equal representation on local school and higher education boards,[33] the Supreme Court in *Salyer* permitted the directors of a water storage district to be elected by agricultural land owners only, with the latters' votes being weighted according to the valuation of their lands. It was reasoned that "the district does not exercise what might be thought of as 'normal governmental' authority" and that "all of the costs of district projects are assessed against land by assessors in proportion to the benefits received." *Id.* at 729, 93 S.Ct. at 1230.

██ Obviously, these exceptions to the one person, one vote requirement occur in contexts too far removed from that of a national political convention for them to be dispositive of the case before us. They do demonstrate, however, that the principle of one person, one vote is not an absolute, to be unthinkingly invoked every time two or more persons are selected to make decisions on other people's behalf, even if the making of those decisions is very plainly "state action." The constitutional command is not one person, one vote but equal protection of the laws, and what it requires by way of representation in a given assembly must depend on the purposes for which the assembly is convened and the nature of the decisions it makes. The Supreme Court's inquiry into these matters has led it to the conclusion that where the assembly exercises formal governmental powers one person, one vote is ordinarily required. A similar inquiry in other contexts may well reveal that the public and private interests in making decisions through some other scheme of representation outweigh the interests served by numerically equal apportionment.

We think the national political parties may validly so conclude with respect to

---

31. The procedures challenged in *Driskell* were mandated by the Louisiana Constitution. Plaintiffs sought to enjoin enforcement thereof, and therefore requested the convening of a three-judge district court pursuant to 28 U.S.C. § 2281 (1970). Their suit was dismissed by a single judge for lack of a substantial federal question, 274 F.Supp. at 3, yet direct appeal was sought in the Supreme Court. The appeal was ruled improper. The Court vacated the judgment and remanded the case "with directions to enter a fresh decree from which a timely appeal may be taken to the Court of Appeals." 419 U.S. at 812, 95 S.Ct. at 26.

32. *Abate v. Mundt*, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971); *Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).

33. *Hadley v. Junior College Dist. of Metropolitan Kansas City*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); *Kramer v. Union Free School Dist.*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). *See also Phoenix v. Kolodziejski*, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (both invalidating restrictions on franchise in elections to approve municipal bond issues).

their presidential nominating conventions. As explained more fully below, these have never had, or been conceived as having, the function of providing a strict one person, one vote representation to a definable national constituency. Weighted representational schemes are only one of the numerous and scarcely distinguishable ways, some of them having judicial sanction, in which the political parties conduct their affairs in something short of a scrupulously democratic fashion. Most significant, the interests they advance by adopting representational schemes of their own choosing seem to us to be of great importance and of clearly constitutional stature.

Political parties are nowhere referred to in the Constitution—not surprisingly in view of their low reputation among our nation's founders. Washington warned his countrymen "in the most solemn manner against the baneful effects of the spirit of party," [34] and Madison thought it a principal task of the new Constitution to hold the "mischiefs of faction" in check. [35] Nonetheless we have had political parties pretty much from the beginning, [36] and with rare and early exceptions we have chosen our Presidents from among the candidates those parties put forward. [37] Like the election itself, early political nominations for President were anything but democratic. Throughout the first part of the eighteenth century they were made by party caucuses—usually comprised of that party's delegation to Congress. Credit for the downfall of "King Caucus" is generally given to Andrew Jackson who successfully fought for, and benefited from, a change to the ostensibly more democratic convention system. [38] That system appears to have been firmly in effect in both major parties by 1840, and in substantially the same form that we are familiar with today.

From the start delegate votes at the convention were apportioned according to each State's electoral college vote. [39] Indeed it is somewhat ironic that the convention, the first major reform of the

---

34. G. Washington, Farewell Address, reprinted in Documents of American History, 169, 172 (H. Commager ed. 1946).

35. J. Madison, The Federalist No. 10, reprinted in The Federalist, 56, 58 (Cooke ed. 1961).

36. John Adams has left us the following description of the way political candidates were chosen even in 1763:

This day learned that the Caucus Club meets at certain times in the garret of Tom Dawes, the Adjutant of the Boston Regulars. He has a large house . . . and the whole club meets in one room. There they smoke tobacco till you cannot see from one end of the garret to the other. There they drink flip I suppose and they choose a moderator who puts questions to the vote regularly; and selectmen, assessors, collectors, firewards, and representatives are regularly chosen before they are chosen in town

. . . . . .

II The Works of John Adams, 144 (C.F. Adams ed., 1850). Perhaps the prevalence of parties in American politics was inevitable. It was early observed that

Americans of all ages, all conditions, and all dispositions constantly form associations. . . . The Americans make associations to give entertainments, to found seminaries, to build inns, to construct churches, to diffuse books, to send missionaries to the antipodes. . . . Wherever at the head of some new undertaking you see the government in France, or a new man of rank in England, in the United States you will find an association.

II A. De Tocqueville, Democracy in America, 106 (Knopf ed. 1945).

37. Regular presidential contests between the Republican and Democratic parties began in 1852. However, the present Democratic Party can trace its origins to the Democratic Republican Party which Thomas Jefferson began to assemble even before the end of Washington's first term. H. Bone, American Politics and the Party System, 28–30 (1971). A case can likewise be made that Hamilton's Federalists and subsequently the Whig Party were the predecessors of the present Republican Party. E. Sait, American Parties and Elections, 205 (1927). If so, then the only Presidents who may plausibly claim not to be the products of the two-party rivalry are James Monroe and John Quincy Adams, who served during a sort of party "interregnum" after the decline of the Federalists and before the rise of the Whigs. See Bone, supra, at 28.

38. See E. Sait, supra note 37, at 245; Bone, supra note 37, at 287.

39. E. Sait, supra note 37, at 249.

nominating process, brought with it an apportionment scheme that bore no relation at all to the relative strength of the parties in the various states, whereas the congressional caucus reflected that strength quite accurately.[40]

There was recurrent criticism of electoral college-based apportionment, particularly in the Republican Party, where it gave inordinate control to delegates from southern States in which the Party had no hope of electoral success. Reform finally came in 1913, and in a way which presents a second irony for this case: the electoral college basis was in effect retained, but an extra vote was awarded to congressional districts which had voted Republican in past elections.[41] Party strength was thus reinstated as a basis for delegate apportionment through a bonus vote system such as the one to which plaintiffs so strenuously object.[42] The Party has employed some such mixture of electoral college-based and bonus votes ever since.[43]

We mention these few historical facts not because we think that what has been true in the past must always remain so, but merely to put the matter in perspective. In requesting that we impose a one person, one vote rule on the Republican Party, plaintiffs are not asking us to

correct a historical aberration contrived at the 1972 convention. They are inviting us to take into judicial hands a process of change and adaptation that still continues within the Party.

We have twice declined that invitation in the *Georgia* and *Bode* cases. It is particularly significant that in the latter case we expressly upheld the parties' long-standing practice of apportioning delegates according to electoral college strength.[44] The Democratic Party formula challenged in *Bode* allocated 54 percent of the delegates on that basis. Although it allocated the remaining 46 percent according to Democratic voting strength as measured in past elections, it was not for that reason, or even because of the analogy to the electoral college itself, that we sustained the formula. Electoral college apportionment was perceived to have an "independent rationality for its use," which was that it reflected "a judgment exercised toward maintaining and enlarging party appeal on a national scale." 452 F.2d at 1309.

In thus upholding electoral college apportionment we have in effect already discarded the notion that national convention delegates must represent some constituency on a one person, one vote

40. John C. Calhoun, an early opponent of the caucus system, was later to write:

Objectionable as I think a congressional caucus for nominating a President, it is in my opinion far less so than a convention constituted as is proposed. The former had indeed many things to recommend it. Its members . . . were the immediate organs of the State Legislatures or the people; were responsible to them, respectively, and were for the most part of high character, standing, or talents. They voted *per capita*; and, what is very important, *they represented fairly the relative strength of the party in their respective states.*

VI. *Works of John C. Calhoun* 247 (Cralle ed. 1968) (emphasis added).

41. See *E. Sait, supra* note 37, at 438.

42. Of course the bonus system still has the effect of making delegate apportionment more

reflective of party strength than it would be if based on electoral college vote alone. In individual cases it may also make the apportionment more reflective of population. Thus, in our case, the fact that California voted for the 1972 Republican nominee, and Massachusetts did not, suggests that the Party is stronger in California. Because of its 1972 vote California receives a bonus under the challenged formula. The bonus redresses to some extent the overrepresentation Massachusetts would otherwise have (as compared to California) both in terms of population and party strength.

43. See *P. David, R. Goldman & R. Bain, The Politics of National Party Conventions* 165–68 (1960).

44. In *Georgia* we confined ourselves to considering, and rejecting, "the precise claim advanced by appellants" that delegate allocation must constitutionally reflect total population only. 447 F.2d at 1280.

basis.[45] Electoral college apportionment obviously is not related to any set of Republican Party members or adherents. It bears some relation to total population, but only a very rough one.[46]

There are any number of other party practices which are seemingly inconsistent with a strict one person, one vote requirement, and which either have survived judicial scrutiny or, we think, would surely do so if challenged. They at least demonstrate the size of the task that the courts would be undertaking were they to impose a one person, one vote rule on the presidential nominating process.

The Republican Party does much of its business through a National Committee, which is malapportioned to the extent of being comprised of two members from each state.[47] Moreover, one of the members must be a woman and one a man, a condition of dubious validity in respect of membership in, let us say, a state legislature.[48] A committee system of such malapportioned and predetermined membership has historically dominated

both parties down to their grass roots.[49] They have been excused from equal representation requirements on the ground that they only administer the party's "internal affairs," [50] but the distinction is not a strong one. In addition to conducting the national convention [51] the National Committee dispenses patronage and party funds.[52] It makes numerous important political decisions during the periods between national conventions—whose policies are favored in party publications and pronouncements, whose local campaigns are aided by appearances of nationally prominent party members, and so on. The fortunes of presidential hopefuls rise and fall with such decisions.

Turning to the delegates themselves, a party might well wish to impose conditions on delegate selection which are inconsistent with an unconstrained, mathematically equal system of representation. The Democratic Party recently did so by establishing quotas for the membership in state delegations of minorities, wom-

45. Our opinion in *Bode* specifically disapproved the ruling of the District Court that the Constitution required a delegate allocation formula "based on the number of Democratic voters voting in one or more immediately preceding Presidential elections." 452 F.2d at 1303.

46. Electors from large States represent up to 4.4 times as many people as do electors from small States. One of Alaska's three electors represents 100,724 people according to the 1970 census. One of New York's forty-one electors represents 443,677 people. *See* Exhibits A, F, & P–2, J.A. 74a, 83a, 183a.

47. *See* Republican Rules No. 19, J.A. 151a ("[The National] Committee shall have the general management of the affairs of the Republican Party in the United States and its territories subject to direction from time to time of the National Convention.")

The importance of the National Committee in an organization which meets in convention only once every four years is underscored by the fact that it would fall to this body to fashion a new delegate allocation formula should the present one be invalidated. *See* note 4 *supra*.

48. *See* Republican Rule 20. State Party Chairman are also *ex officio* members of the Republican National Committee. Republican Rule 19(b), J.A. 151a.

49. *See, e. g.*, the facts of *Seergy v. Kings County Republican County Comm.*, 459 F.2d 308 (2d Cir. 1972). Delegates to the 1976 Republican National Convention will also select Resolutions, Credentials, Rules and Order of Business, and Permanent Organization Committees, composed, like the National Committee, of one man and one woman from each State. *See* Republican Rule 14, J.A. at 150a.

50. *Seergy v. Kings County Republican County Comm.*, 459 F.2d 308 (2d Cir. 1972); *Lynch v. Torquato*, 343 F.2d 370 (3d Cir. 1965); *Dahl v. Republican State Comm.*, 319 F.Supp. 682 (W.D.Wash.1970).

51. For an account of the crucial role that administrative decisions (appointments of subcommittees and their chairmen, delegate seating and accommodations, media coverage, etc.) played in the 1968 National Democratic Convention *see Commission on the Democratic Selection of Presidential Nominees, The Democratic Choice* 40–43 (Hughes Commission Report, 1968).

52. *See Bone, supra* note 37, at 180–81, 201–04.

en, and young people.[53] Could a national convention take the more drastic step of refusing for some reason perceived to be in the Party's best interests to seat a State's delegation *at all*? Apparently. so. The Supreme Court stated in *Cousins v. Wigoda* that "[t]he Convention was under no obligation to seat the respondents [whom the Illinois court ordered seated] but was free . . . to leave the Chicago seats vacant and thus defeat the objective." 419 U.S. at 488, 95 S.Ct. at 548.

"Equal" apportionment of delegates among the states is presumably sought in order to insure "equal" representation of the people in those states. Yet the actual selection of delegates at the state level varies from the highly democratic to the opposite extreme. In a number of states the selection is made not in a primary election but through a series of local, county, and state caucuses and conventions. Often these are malapportioned,[54] and often voter participation is so slight as to make the selection process one virtually (or even officially) of appointment by party officials.[55] A practice that is more defensible perhaps, though scarcely more "democratic," is the granting of *ex officio* delegate status to party officials or public office holders, presumably because of their special wisdom and expertise.[56]

There are a number of respects, then, in which the parties conduct their affairs other than by giving equal attention to the preferences of all voters, or even all party adherents.[57] Perhaps this is not

**53.** *Democratic National Commission on Party Structure and Delegate Selection, Mandate for Reform, reprinted in* (and hereinafter cited to) 117 *Cong.Rec.* 32909, 32915 (1971). The quotas were not mandatory, but, as one member of the Commission which conceived the quota system reports, "most state delegations chose to play it safe by making sure they had close to the required percentages of each favored group." *Ranney, Changing the Rules of the Nominating Game, Choosing the President* 78 n. 1 (Barber ed., 1974). A comparable committee of Republicans was appointed to recommend changes in the rules for selection of delegates to that Party's 1972 convention. One of its recommendations, not accepted, was that "each State [shall] include in its delegation to the Republican national convention delegates under 25 years of age in numerical equity to their voting strength within the State." II *Report of the Delegates and Organization Committee* 5–9 (Republican National Committee publication, 1971).

**54.** *See, e. g.,* the facts of *Maxey v. Wash. State Democratic Comm.,* 319 F.Supp. 673 (W.D. Wash.1970); *Irish v. Democratic-Farmer-Labor Party of Minn.,* 287 F.Supp. 794 (D.Minn. 1968). The delegate selection procedures of the states are surveyed in *Developments in the Law-Elections,* 88 *Harv.L.Rev.* 1111, 1153–54 (1975). Republican Rule 31 permits a selection of national convention delegates by primary election, "[b]y Congressional District or State Conventions," or "[b]y the Republican State Committee or Governing Committee in any State in which the law specifically authorizes the election of Delegates . . . in such manner." J.A. 153a–154a.

**55.** *See Hughes Commission Report, supra* note 51, at 19–27, 24 ("The Commission's study indicates that over 600 delegates to the 1968 Convention were selected by processes which have included no means of voter participation since 1966."); *Note, Constitutional Safeguards in the Selection of Delegates to Presidential Nominating Conventions;* 78 *Yale L.J.* 1228, 1240–52 (1969).

**56.** The McGovern-Fraser Commission reported that this was the practice of the Democratic Parties of a number of states, one of which selected 12 of its 47 delegates to the 1968 Democratic National Convention on an *ex officio* basis. *Mandate for Reform, supra* note 53, at 32914.

Both parties have attempted to eliminate some of the described practices. *See generally Mandate for Reform, supra* note 53; *Report of the Delegates and Organization Committee, supra* note 53. However, even the more far-reaching reforms of the Democratic Party did not eliminate entirely the practice, found to be prevalent in about one fifth of the States, of selecting delegates by committees of party officials. *See Mandate for Reform, supra* note 53, at 32914, 32917.

**57.** It will perhaps add to our perspective to note that the United States is virtually unique among western democracies in the degree to which the selection of party candidates is entrusted even to the party rank and file. Elsewhere this is regarded as a function of the party leadership. *See L. Epstein, Political Parties in Western Democracies* 201–32 (1967). The British system for selecting candidates for Parliament is judged in the cited study to be

surprising. A party is after all more than a forum for all its adherents' views. It is an organized attempt to see the most important of those views put into practice through control of the levers of government.[58] One party may think that the best way to do this is through a "strictly democratic" majoritarianism. But another may think it can only be done (let us say) by giving the proven party professional a greater voice than the newcomer. Which of these approaches is the more efficacious we cannot say, but the latter certainly seems a more accurate description of how political parties operate in reality.

■■■ What is important for our purposes is that a party's choice, as among various ways of governing itself, of the one which seems best calculated to strengthen the party and advance its interests, deserves the *protection* of the Constitution as much if not more than its condemnation. The express constitutional rights of speech and assembly are of slight value indeed if they do not carry with them a concomitant right of political association. Speeches and as-

semblies are after all not ends in themselves but means to effect change through the political process. If that is so, there must be a right not only to form political associations but to organize and direct them in the way that will make them most effective.

The Supreme Court has frequently stressed the close kinship of the freedoms of speech and of political association. *See, e. g., Kusper v. Pontikes,* 414 U.S. 51, 56–57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). It has declared that "[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957). It has invoked the First Amendment to strike down state restrictions on access to the general election ballot, stating that "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win

far more typical, and is described in the following terms:

> The types of local leaders dominating the process vary from party to party and from locality to locality. They may, for instance [in the Labour party], be trade-union leaders rather than just political activists. But in any case they are relatively few in number. Candidate selection is not the business of the party rank and file. . . . There is no need—in fact, it is usually regarded as undesirable—for aspirants to campaign before the membership. Candidate selection is meant to be oligarchical.

*Id.* at 220. Canada's major political parties conduct "national leadership conventions" which resemble ours in the sense that they purport to be representative of the party membership. The representational scheme, however, is one which gives power even more explicitly to the individuals and groups who contribute the most to the party. At the 1968 Conservative Party convention, for example, 35 percent of the delegates were selected on an *ex officio* basis from among "the major officers of federal and provincial party association, women's organizations and university clubs, along with members of Parliament, the Senate, and provincial legislatures." *J. Lele,*

G. C. Perlin & H. G. Thorburn, The National Party Convention Party Politics in Canada 109 (Thorburn ed. 1972). *See also U. Parris, The Convention Problem* 36–37 (1972).

**58.** This point is driven home by the difficulty of determining what exactly is the "constituency" of a national convention. Is it the entire population, much of which may have not the slightest interest in what the convention decides? Is it the registered party membership, a class which does not even exist in some states? Plaintiffs contend that it is the set of voters who voted for the party's candidates in past elections. That is a different set for each election, of course, a fact that only serves to demonstrate that the circumstances of those elections may have been such as to attract to the party's candidates large numbers of voters who retain no continuing interest in its fortunes. If we cannot identify with any confidence the set of people whose preferences are to be given equal and accurate expression at a party convention, then perhaps we must admit that that is not the primary purpose of such a convention at all. The primary purpose is to chart a course for the advancement of the party's ideals, and it is in that light that the requirements of equal protection are to be discerned.

votes." *Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968).[59]

Last term the Court in *Cousins v. Wigoda* placed the internal workings of a political party squarely within the protection of the First Amendment. The delegates whom the Illinois courts had ordered seated in that case had been selected in accordance with Illinois law, but not the Democratic Party's Guidelines. Illinois claimed "a compelling interest in protecting the integrity of its electoral process." The Court held that this interest could not prevail against the "constitutionally protected rights of association" which the Party exercised in seating the delegation of its choice. 419 U.S. at 489, 95 S.Ct. 541. Nor can the case be explained as one in which the Court was preferring the delegates who were elected in the clearly more democratic way: those whom the Illinois courts ordered seated were elected in primaries; those who were seated by the Party were chosen in private caucuses. *Id.* at 478–80, 95 S.Ct. 541. If First Amendment rights are exercised when a Party determines the make-up, or perhaps even the existence, of state delegations, we think the same is true when it determines their size.

The First Amendment is of course not our only concern. We are keenly aware that "[a]s a practical matter, the ultimate choice of the mass of voters is predetermined when the nominations have been made."[60] If the right to vote is a right to true participation in the elective process, then it is heavily implicated in the nomination process. We do not deny this, but rest our judgment on the view that, as between that right and the right of free political association, the latter is more in need of protection in this case. As is further elaborated below, the right to organize a party in the way that will make it the most effective political organization seems clearly at stake here. The right of one person to one vote is of course preserved in the general election. Theoretically at least, persons dissatisfied with the choice facing them in that election may gain access to the ballot by means other than a major party nomination. They could, of course, form their own party. Of more practical importance is the fact that there are two major parties, which for the time being at least are in intense competition. Persons not heard in one party may be welcomed in the other, and if there are enough such defections, the offending party may lose the general election, as both parties must be well aware.[61]

We conclude, therefore, that the Equal Protection Clause, assuming it is applicable, does not require the representation in presidential nominating conventions of some defined constituency on a one person, one vote basis. It is satisfied if the representational scheme and each of its elements rationally advance some legitimate interest of the party in

---

**59.** *See also G. Abernathy, The Right of Assembly and Association* 171–244 (1961).

**60.** *Newberry v. United States,* 256 U.S. 232, 286, 41 S.Ct. 469, 484, 65 L.Ed. 913 (1921) (Pitney, J., dissenting).

**61.** The contest in this case of two conflicting constitutional rights suggests an analogy to *Columbia Broadcasting System v. Democratic National Comm.,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), holding that the First Amendment did not require broadcast licensees to accept editorial advertisements. Broadcasters and political parties are similar in the sense that both, although nominally private entities, are in a position to hinder the exercise of other citizens' constitutional rights,

in that case freedom of speech and in this case the right to vote. Requiring that such entities give the same protection to those constitutional rights that the government must give is a tempting solution, one which had in fact been adopted by the lower court in *Columbia Broadcasting, see Business Executives Move for Vietnam Peace v. FCC,* 146 U.S.App.D.C. 181, 450 F.2d 642 (1971). However, that solution carries with it the price of interference with the First Amendment rights of the entities themselves, and it was in part on this ground that the Supreme Court reversed. 412 U.S. at 120–21, 93 S.Ct. 2080. To the extent the conflict is the same in our case, it must be resolved in the same way.

winning elections or otherwise achieving its political goals. We turn, then, to the question of whether the challenged formula meets this test.

B. *Justifications of the Challenged Formula.*

By far the greatest number of delegates (72 percent) are allocated according to the electoral college vote of the States. We upheld this as a basis of representation in *Bode*; and we pursue the matter further only because the justification for electoral college apportionment carries within it much of the justification for this entire formula. A State's share of the electoral college vote only roughly approximates its share of the population. It precisely reflects the relative importance of the state to the party in terms of winning the presidential election. As we stated in *Bode,* "the primary function of a national party convention . . . is to select among a field of available persons Presidential and Vice-Presidential candidates most competent to perform the duties of office, *yet capable of attracting a sufficient number of popular votes to carry the requisite number of States in the election."* 452 F.2d at 1309 (emphasis added).

The "requisite number of States" is the number with a majority of electoral college votes. The delegates from those states will presumably know best what kind of candidate is likely to carry them. It may be helpful, or even necessary, to have running mates who actually come from those states. If so, it may be wise, especially if it is thought that delegates from other states may ignore this fact in favor of their "favorite sons," to "build in" for candidates from large states the advantage of large home-state delegations. Assuming, as we have, the constitutional validity of delegate allocation measures taken to improve the Party's chances for victory, this one is hardly irrational.

It could stand some improvement, of course. As between two states of equal electoral importance, a party could more profitably focus its attention on the one in which it has a chance of victory. This purpose we think is rationally served by the victory bonus system. A state which has gone Republican in the past may do so again. If electoral college apportionment weights the vote of the states according to the value of the prize, the victory bonus system does the same according to the likelihood of winning it.

The victory bonus system may help to keep a state in the Republican camp not only by orienting party policies to that state's interests, but also by providing a reward and incentive for the efforts of that state's party organization. Whether or not it is an effective incentive, it may be the only one that a national party has to offer. In any case, having accepted the legitimacy of such party-strengthening measures, we can hardly say that it is irrational.

It is most rational, perhaps, with respect to the "proportionate" victory bonuses, since a likelihood of success is more important in a large state than a small one. Not surprisingly, then, it is the "uniform" bonuses which have come in for the severest criticism from plaintiffs, not to mention the district judge. But these, too, seem to us to be rationally conceived. Success in a given state may have a certain value to the party quite out of proportion to the state's size. When the returns are counted, on a state-by-state basis, carrying Arkansas will in a sense give the party the same psychological boost as carrying Tennessee (more than twice its size). And carrying a state, Arkansas or Tennessee, may also mean electing two Senators and a Governor on the presidential coattails. Holding these offices undoubtedly has a certain "uniform" importance to the party, in terms of the immediate power they represent and also because they are the springboards for future Presidential candidates. These considerations seem to us adequately to justify the uniform victory bonus of six votes for success in a Presidential election. If the bonus for success in state level elections requires a separate justification, we

think it is present in the need, which plaintiffs so heavily stress, to measure party strength by success in more than one past election.

Objection is also made to the allocations to the District of Columbia (14) and to Guam and the Virgin Islands (4 each). The fourteen delegates from the District of Columbia clearly represent disproportionately few voters, but do they disproportionately represent the importance of this particular governmental unit to the party? No one who has lived in the District can deny the special importance of political ambiance in the city in which the Nation's business is done. As for the territories, their four votes each will hardly comprise a decisive bloc at the convention; and the party might well have concluded that a delegation of four is the smallest that it makes any sense to bring the considerable distance to the convention site.

There are other justifications for the various elements of this formula, as there are certainly countervailing objections to the ones we have mentioned. The uniform importance of the states might be thought adequately reflected in electoral college vote. Their importance in terms of party strength could perhaps be more accurately reflected by allocating delegates according to the size of the party vote in past elections. And the chances for success in future elections might be maximized by paying more attention to "swing" states than "safe" ones. Yet it is the essence of the First Amendment rights, which the parties exercise, that they may make their own contrary (and rational) judgments without interference from the courts.

■ It is urged that this formula represents nothing more than an effort by party members from strongly Republican states to perpetuate their control.[62] But it seems to us that the First Amendment protects their power to do precisely that. The Party could have chosen a delegate allocation scheme calculated to broaden its base, by giving special influence to delegates from States where the party is weak. Instead it appears to have chosen to consolidate its gains in states where it has been strong. We are not about to hold that this is an irrational way to seek political success. As for those aspects of the formula which treat the states on a uniform basis and thus give disproportionate influence to the smaller states, how could we say that they do not rationally serve the important cause of cohesiveness among the various state parties, when it took precisely such a scheme to bring about the union of the states themselves?[63]

■ We therefore hold that the formula does not violate the Equal Protection Clause. To the extent that voting rights are involved, warranting close judicial scrutiny, these rights are offset by the First Amendment rights exercised by the Party in choosing the formula it did. We must emphasize that this is only true because the formula rationally advances legitimate party interests in political effectiveness. The same might not always hold true. There are no racial or other invidious classifications here.[64] If there were, the Party's entitlement to constitutional protection would be as slight as those of the victims would be strong. Similarly, we have said that voting

---

**62.** Plaintiffs put special emphasis on this point, arguing that the delegates from overrepresented States, like legislators in a malapportioned legislature, can perpetuate their power indefinitely. They omit to mention that an apportionment based on Party vote could have precisely the same effect, if delegates from States where that vote has been high force the nomination of candidates that will keep it so, at the expense of the Parties in other States.

**63.** See C. Rossiter, Parties and Politics in America 12 (1960) (describing the national

parties as no more than "loose confederacies of state parties").

**64.** Plaintiffs have repeatedly stressed that particular states and regions are favored under the formula. This is only because the uniform and electoral college-based allocations of the formula tend to favor small states, and the victory bonuses tend to favor strongly Republican states. Neither classification is invidious. The first is sanctioned in the Constitution, and all that is required to avoid the effects of the second is success at the polls.

rights are not as heavily implicated in a nomination as in an election. It might be otherwise in a case where there is only one party with a realistic chance to win the election, and where a vote in the nominating process is the only effective vote that can be cast.[65]

These *caveats* have no significance in the present context other than to suggest that, although courts should be slow to interfere with the internal processes of political parties, circumstances can be conceived of wherein they may grant relief. Where such circumstances do not exist, *Georgia, Bode,* and this case should serve to discourage resort to this court for the resolution of intra-party differences.[66]

The judgment of the District Court is reversed, and the case is remanded with directions to dismiss the complaint.

*It is so ordered.*

MacKINNON, Circuit Judge (concurring):

In my opinion, the Ripon Society has no standing to bring this suit, and I would therefore direct the dismissal of the complaint as to it. *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 224, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972) ("[A] mere 'interest in a problem,' no matter how longstanding the interest and how qualified the organization is in evaluating the problem, is not sufficient by itself to

---

**65.** We may distinguish *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), on this basis. It is clearly the Supreme Court case most closely in point. Having first announced the one person, one vote rule, it applied that rule to a primary election held to select candidates for state-wide offices. Georgia's practice of giving unequal weight to votes cast in different districts was invalidated. Justice Douglas reserved the question of whether the same would be true if nominations were made through a convention system. *Id.* at 378 n. 10, 83 S.Ct. 801. We see no persuasive distinction on that basis (to the extent that convention delegates are bound by primary votes, the systems are identical), or on the basis of *Gray's* having involved nominations at the state rather than the national level. It was, however, a case dominated by the fact of one party rule in Georgia. The District Court had noted that it was "known to all that the Democratic candidate has, without exception, at least during the present century, been the choice of the voters at the General election." *Sanders v. Gray,* 203 F.Supp. 158, 167 (N.D.Ga.1962). If another distinction is necessary, it is that the use of the weighted-vote primary could hardly be taken as an exercise of First Amendment rights by one of the parties. It was mandated by a state statute, applicable to all parties, and passed some forty-five years earlier. *See* Neill Primary Act, Georgia Laws 1919 p. 183, *repealed by* 34 Ga. Code Ann. § 2001 (1970); *Sanders v. Gray,* 203 F.Supp. at 159.

**66.** The deference we have accorded to the defendant's political decisions should be sufficient to dispel the spectre that Judge Wilkey raises of a flood of further litigation on the eve of the 1976 conventions. No doubt his preferred disposition of a finding of no state action and no justiciability would do the job even more effectively, but by the same token it may go too far. The invidious discrimination and one party rule cases present difficult issues not present in this appeal and not necessary to its decision. We wish to reserve them.

We are not certain that Judge Wilkey has succeeded in doing so. He makes no reference to one party rule situations. In discussing state action he purports to reserve the case of racial or other invidious classification, which he appears to believe can always be dealt with by the doctrine that a lesser degree of a state involvement will support a finding of state action in such circumstances. As the complainants in *Moose Lodge* can testify, however, racial discrimination is not enough if the indicia of state action are otherwise lacking, and Judge Wilkey's opinion suggests that they are indeed utterly lacking here.

Judge Wilkey makes no reference to the invidious discrimination case in his discussion of justiciability, and his conclusions in that regard are so sweeping as to leave little room for it. Presumably, some way could be found to say that that case is justiciable while this one is not. Whether in doing so we could avoid the appearance of inconsistency or manipulation of the doctrine is another question. We spare ourselves these difficulties, and preserve a greater flexibility, by choosing a disposition on the merits, to which the same underlying considerations of political party autonomy so readily lend themselves.

[confer standing on the organization.]"). Of course, the presence of the individual plaintiffs, who do have standing, means that Ripon's lack of standing is not fatal to this action.

With the above exception, I concur in Judge McGowan's opinion.

**DANAHER, Senior Circuit Judge (concurring in the result):**

Perhaps the exercise of greater caution would forfend against my expressing any disagreement from what has been said by our respected colleague, Judge McGowan. He has written so well and has said so much with which I am in accord that, possibly, I should suppress comment. Were I convinced that properly we could here reach the merits, I would concur in his ultimate conclusions.

It is my judgment that we may not—and therefore that we should not—reach the merits. I am persuaded that jurisdiction is wanting in that: 1, the respective Ripon plaintiffs lacked standing to initiate this action; and 2, the issue submitted on this record is nonjusticiable. I thus join substantially [1] in the respective discussions tendered by my colleagues, Judges Tamm and Wilkey.

### Introduction

Let me turn immediately to an important aspect of the business before us. Involved is the Republican Party's plan, embodied in its Rule 30, for the *allocation* to its 1976 Convention of delegates from the various States, the Territories and the District of Columbia. There is a real distinction between the Republican Party's allocation program and the "state" problems involved in "apportionment" cases treating of legislative reapportionment plans or dealing with Congressional redistricting issues and similar situations which, from time to time, have engaged the attention of the Court.[2]

The Ripon plaintiffs, in their allegations of record here, repeatedly have spoken of the "apportionment of delegates." In their motion before the Supreme Court they had alleged in their paragraph 3:

The stay of the injunctive portion of the District Court's order is wholly inconsistent with the procedure approved by this Court for the granting of relief in *reapportionment cases* cited and followed by the District Court. *See* especially *Reynolds v. Sims*, 377 U.S. 533, 584–586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). (Ripon plaintiffs' motion, Supreme Court file, dated August 17, 1972). (Emphasis added.)

Justice Rehnquist did not miss the point, however, for he specifically wrote in *Republican Committee v. Ripon Society, supra* note 1, 409 U.S. at 1225, 93 S.Ct. at 1477:

In the case at bar, of course, we deal with a *delegate-allocation dispute* that retains importance until 1976 *rather than a credentials dispute* such as was involved in *O'Brien v. Brown* [409 U.S.

1. For example, I see no need for us to overrule this court's earlier opinions in *Georgia v. National Democratic Party*, 145 U.S.App.D.C. 102, 447 F.2d 1271, *cert. denied*, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971); and in *Bode v. National Democratic Party*, 146 U.S. App.D.C. 373, 452 F.2d 1302 (1971), *cert. denied*, 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972). Different treatment undoubtedly would have been developed if there then had been available the Court's discussion in *O'Brien v. Brown*, 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972), *Cousins v. Wigoda*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) and the Memorandum Opinion by Rehnquist, J., in *Republican Committee v. Ripon Society*, 409 U.S. 1222, 93 S.Ct. 1475 (1972).

2. *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), and *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), each of which, among many others, demonstrably involved "state" action. We are not here talking about a "right to vote" as in *election* situations, *e. g.*, *United States v. Classic*, 313 U.S. 299, 318, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), or *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), after constitutional prerogatives had been denied.

1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972)]. (Emphasis added.)[3]

## I

It must be remembered that nothing in the Constitution refers to national party conventions. Congress has passed no statute giving *access to the courts* in respect of the allocation of delegate strength to a national party convention, and Congress certainly knows how to do just that, were Congress so to decide. Contrast the instant situation with the provisions of the Federal Election Campaign Act, as amended, where the codified 2 U.S.C. § 437h(a) provides:

> The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President of the United States may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act . . . .[4]

This court recently considered the import of this language in *Buckley v. Valeo*, 171 U.S.App.D.C. 172, 201, 519 F.2d 821, 850 (1975) (*en banc*) where it was pointed out that the section

does not entitle the eligible plaintiffs to raise any conceivable constitutional issue with respect to the Act and the relevant criminal sections, no matter how remote or speculative. We perceive no congressional intent to waive article III's requirement that there be a present "case or controversy." The declaratory judgment, often seen as the outer limits of article III jurisdiction, nevertheless requires that there be an actual controversy. (Footnotes omitted.)

It is not in any way to disparage the purposes of The Ripon Society, Inc. that we say, flatly, the corporation totally lacks standing to sue. Surely it is entitled to no relief on its own account; obviously it has no vote. The Supreme Court has told us in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972),

> a mere "interest in a problem," no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization "adversely affected" or "aggrieved" within the meaning of the APA. *Id.*, at 739, 92 S.Ct. at 1368.

*And see United States v. Richardson*, 418 U.S. 166, 177–180, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974).

---

3. Mr. Justice Blackmun further particularized in *Chapman v. Meier*, 420 U.S. 1, 3, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975):

 This case presents the issue of the constitutionality of a federal-court-ordered *reapportionment* of the North Dakota Legislature. That State, like many others, has struggled to satisfy constitutional requirements for *legislative apportionment* delineated in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) * * * [and other cases.] (Emphasis added.)

 The Ripon plaintiffs simply fail to distinguish the "apportionment" problems arising under state law from action by the Republican Party Convention. In *Gray v. Sanders*, 372 U.S. 368, 378, 83 S.Ct. 801, 807, 9 L.Ed.2d 821, note 10 (1963) the Court expressly specified:

 We do not reach here the questions that would be presented were the convention system used for nominating candidates in lieu of the primary system.

 Even in *Reynolds v. Sims*, text *supra*, 377 U.S. at 565, 84 S.Ct. at 1383, the Court itself explained that a citizen "has an inalienable right to full and effective participation in the political processes of his State's *legislative bodies*," and further, that "full and effective participation by all citizens in *state* government requires, therefore, that each citizen have an equally effective voice in the *election* of members of his *state legislature*." (Emphasis added.)

4. *See* Powell, J., concurring in *United States v. Richardson*, 418 U.S. at 194, 94 S.Ct. at 2955: ". . . the Court has not broken with the traditional requirement that, *in the absence of a specific statutory grant* of the right of review, a plaintiff must allege some particularized injury that sets him apart from the man on the street." (Emphasis added.) *See also, id.*, notes 15 and 16.

The individual Ripon plaintiffs here stand on no higher plane. They allege no specific injury pertinent to themselves. No statute has authorized the institution of this action by them. There has been no denial of a right in any of the individual plaintiffs to a seat in the Republican Convention. Indeed a national party convention is under no obligation to receive any of these Ripon plaintiffs as a delegate, as *Cousins v. Wigoda*, 419 U.S. 477, 488, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) makes clear.

The alleged ground of aggrievement is a mere abstraction.[5] These individual Ripon plaintiffs have afforded no predicate for action by the courts. They are in no different position on any account than is any member of the public.[6] It would seem inevitable that their action should be barred. They lack standing within the test laid down in *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 220–221, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974) where the Court said

> Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution. It adds the essential dimension of specificity to the dispute by requiring that the complaining party have suffered a particular injury caused by the action challenged as unlawful. This personal stake is what the Court has consistently held enables a complainant authoritatively to present to a court a complete perspective upon the adverse consequences flowing from the specific set of facts undergirding his grievance. Such authoritative presentations are an integral part of the judicial process, for a court must rely on the parties' treatment of the facts and claims before it to develop its rules of law. Only concrete injury presents the factual context within which a court, aided by parties who argue within the context, is capable of making decisions. (Footnote omitted.)

## II

Even were we to assume, contrary to what has been said in Part I, *supra*, that these Ripon plaintiffs have standing, we are nonetheless bound to order that their complaint be dismissed. The issue they have tendered, in my view, is simply nonjusticiable.[7]

There is much more involved in a party's national convention than its merely nominating candidates for the presidency and vice presidency. That convention, (perhaps *most* importantly, at least on occasion), will be called upon to set forth the aims and political objectives of the political party and its adherents.[8]

---

**5.** While not controlling here, to be sure, even in an "apportionment" setting, Mr. Justice Frankfurter undertook his own definition of what he deemed to be an abstract claim. The term applies here in light of our record. Even respecting a state apportionment issue, Mr. Justice Frankfurter put it thus:

> . . . The claim is hypothetical and the assumptions are abstract because the Court does not vouchsafe the lower courts—state and federal—guidelines for formulating specific, definite, wholly unprecedented remedies for the inevitable litigations that today's umbrageous disposition is bound to stimulate in connection with politically motivated reapportionments in so many States. In such a setting, to promulgate jurisdiction in the abstract is meaningless. It is as devoid of reality as "a brooding omnipresence in the sky," for it conveys no intimation what relief, if any, a District Court is capable of affording that would not invite legislatures to play ducks and drakes with the judiciary. *Baker v. Carr*, 369 U.S. 186, 267–268, 82 S.Ct. 691, 738, 7 L.Ed.2d 663 (1962).

**6.** *Cf. Massachusetts v. Mellon*, 262 U.S. 447, 487, 43 S.Ct. 497, 67 L.Ed. 1078 (1923).

**7.** I will not repetitively cover ground which has been so well treated by my colleagues, Judges Tamm and Wilkey. I find myself in substantial accord with their views. I feel, however, that certain aspects of our problem may further be analyzed.

**8.** Freedom to associate with others for the common advancement of political beliefs and ideas clearly is protected activity. *Cousins v. Wigoda*, 419 U.S. 477, 487, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975). Three concurring justices saw the right of members of a political party to gather in a national political convention to be at the very heart of the freedom of assembly and association, *id.* at 491, 95 S.Ct. 541. Powell, J., observed, *id.* at 497, 95 S.Ct. at 552,

To succeed in an election, the presidential nominee in a nation as populous and with interests as diverse as ours must carry the states whose electoral votes cumulatively will provide the victory which he seeks and which the party adherents desire. But that is not all. That presidential nominee, in addition to promoting his own candidacy, will be expected by the party and its adherents to contribute to the election of United States Senators and members of the House who will be expected to assist in the accomplishment of the party's program. Long before the national convention, on the hustings, via televised appeals, in local debates, through published statements and otherwise, party candidates for national office as well as for both branches of the Congress and for gubernatorial recognition, will have sought to arouse the electorate and to recruit party adherents. The allocation of delegates will thus serve a twofold purpose.

Organization of public thought and the rallying of voters behind the presidential nominee and his program will become essential not only in an appeal to party members but to independent voters and even to members of an opposition party.[9] It is a fundamental truism that any party must seek to maximize voting support from its already registered voters. Appeal to local constituencies often enough can be marshalled through leadership already there recognized because of qualities long since made evident.

Recognition of such individuals in delegate allocation may not only add strength to the management of the convention, but additionally will tend to enhance the possibilities of garnering the *electoral* vote state by state, and cumulatively thus result in election of the presidential nominee. The candidate and the party adherents who can bring about that result will achieve the very purpose for which associational significance is recognized and protected. Not to be forgotten is the fact that the electoral vote of a particular state may turn upon a mere plurality, no matter how small, of that state's voters. Allocation of delegates to *such* states—and the selection and seating[10] of *such delegates* as can advance "the cause"—will seldom be out of mind among party leaders of either major party. The ultimate popular will, of course, ascertained at the election itself, reflects the collective mind of the American voter, and success or repudiation of the candidate, or the party will follow.[11]

Taking account of what a party may seek to do and what its adherents think it should do to accomplish the party's objectives, may we not wonder what steps are open to a court to manage the party's convention composition in delegate allocation or otherwise? Success is what the party seeks, of course. In light of what we have been saying, and having over a period of some three decades gained no more than a minority status, the Republican Party in 1972 had adopted rules and a program designed, it was thought, to improve its status and to

---

that "[t]he National Convention of the Party may seat whomever it pleases, . . .".

9. Consider results in the 1972 presidential election when the Republican candidate carried Louisiana where 97 per cent of the registered voters were Democrats! Disillusionment with a candidate and his announced program can be an intangible factor.

10. A convention, after all, may refuse to seat delegates deemed hostile to a party's potential candidate and disruptive of the party's objectives or likely to diffuse support among the voters. *Cousins v. Wigoda, supra,* 419 U.S. at 488, 95 S.Ct. 541, *and see* Mr. Justice Powell remarking *id.* at 497, 95 S.Ct. at 552, that "[t]he National Convention of the Party may seat whomever it pleases . . ."; conversely, delegates who deem themselves and their views repelled by an inhospitable convention may even "take a walk" from their own party as the Republicans found out in 1912.

11. Most of us need not even "look at the record" to recall the two "disaster" years for the presidential nominees, respectively, the Republican in 1964, and the Democratic in 1972.

achieve that success.[12] It is clear from the record before us, note 12 *supra,* that views largely shared by the Ripon plaintiffs were presented at length during the 1972 convention and finally were rejected by a vote of nine hundred ten to four hundred thirty-four. Losers at the convention, claiming a denial of equal protection, the Ripon plaintiffs moved to the courts, and here we are.[13]

Justiciability of state ordered and state regulated proceedings in this area afford us no guidance in the present context. Were Congress to have acted and to have regulated the composition of the national convention of a major political party, we would have before us a totally different problem.[14] It may be supposed that few jurists have been more perceptive than the late Mr. Justice Jackson who realized that the "one man-one vote" approach involved scrapping the present electoral system and providing for direct election of the President. Dissenting in *Ray v. Blair,* 343 U.S. 214, 234, 72 S.Ct. 654, 664, 96 L.Ed. 894 (1952), he wrote:

> The demise of the whole electoral system would not impress me as a dis-

aster. At its best it is a mystifying and distorting factor in presidential elections which may resolve a popular defeat into an electoral victory. At its worst it is open to local corruption and manipulation, once so flagrant as to threaten the stability of the country. To abolish it and substitute direct election of the President, so that every vote wherever cast would have equal weight in calculating the result, would seem to me a gain for simplicity and integrity of our governmental processes.

After the order had been entered that this case be set for hearing en banc, we invited the Democratic National Committee as *amicus* to submit a brief and to argue. We directed attention to certain specific points including those of standing and justiciability. Recognizing that there are issues involved in this litigation which bear upon the "traditional" role of political parties and the "traditional" nature of the political process, Amicus told us on brief "the Democratic Party has a vital interest in the actions taken by this court and welcomes the opportunity to present its views." [15]

---

**12.** Our record is replete with evidence of the Party's approach. In support of its motion for summary judgment, there appears the Party's "Statement of Material Facts," J.A. 187. Additionally, at J.A. 193 is supplied the history of delegate allocations in each presidential year, commencing with the year 1900 through 1972. Various evidentiary materials include the affidavit of Tom Stagg, J.A. 203, with its detailed explanation of the Party's new Rule 30; the affidavit of William C. Cramer at J.A. 210, supplemented by that of Governor Reagan at J.A. 233, that of Senator Tower at J.A. 237 and that of Gerald R. Ford, Minority Leader of the House, at J.A. 251. Exhibits and statistical tables complete the data, culminating with the affidavit of the Chairman of the Republican National Committee, Senator Robert Dole, J.A. 274, describing the efforts of the Party to achieve a consensus respecting a system of allocation of delegates.

**13.** Even if the courts were somehow to fashion an allocation of delegates, there can be no control over how those delegates will vote. Many will have come to the convention committed to "favorite sons" or even to have been hostile to the nomination of the candidate ultimately to

be selected. Realignment of delegates' votes may follow after consultations among delegations from the different states. Coalitions can eventuate and turn out to be powerful enough to carry the day. In such circumstances, it may seem difficult to ascertain whose vote is being "diluted" !

In Convention Decisions and Voting Records, 2d edition 1973, R. Bain and Parris, it is reported that in the 1952 Republican Convention, after a first ballot, 595 votes had been cast in favor of the nomination of General Eisenhower when 604 votes were necessary for decision. The chairman of the Alabama delegation yielded to the State of Minnesota, the chairman of which delegation thereupon cast 19 votes for General Eisenhower. Nomination was thus achieved.

**14.** But Congress has never done so; *and see* footnote 3, *supra.*

**15.** We can readily recognize that "vital interest." Consider, *e. g.,* that the Democratic National Committee has adopted its rules for the allocation of delegates to the 1976 Democratic National Convention. The Party's promulgat-

Amicus continues that the decision of the district court, in accepting jurisdiction and in holding the claim asserted by Appellants to be justiciable, represents a departure from the historical reluctance of courts to intrude in the political process, in the absence of racial discrimination or clear state action. It is the view of the Democratic National Committee that such a departure is both unwarranted and unwise. Because of the well-established First Amendment rights of political parties and their adherents, and the clear lack of judicially manageable standards involved in any question of delegate allocation, this court should adopt the view expressed in *Irish v. Democratic-Farmer-Labor Party,* 287 F.Supp. 797 (*sic*) (D.Minn.1968), *aff'd,* 399 F.2d 119 (8th Cir. 1968). The court in *Irish* refused to intervene in a delegate allocation matter, and expressed the view that the political process is best served by the compromise and consensus institutionalized in the political parties. Amicus Brief at 2.

Asserting the position of the Democratic National Committee, Amicus cogently has argued that questions involving the allocation of delegates at a national convention will reflect policies which are subject to change and development, in part, at least, because of changes in a party's constituency. Associational prerogatives include retention of flexibility in a party's shaping its own organization.

One may conclude that one party may seek its strength in a certain area where dependence upon a liberal and urbanized appeal can be expected, especially in light of past performance, to yield the greater effectiveness. The party very properly may oppose judicial intervention in the political process where in addition to the business of nominating candidates, "vital" rights of association guaranteed by the Constitution are also involved, *Cousins v. Wigoda, supra,* 419 U.S. at 487, 95 S.Ct. 541.[16] It would seem to follow that a party, be it Democratic or Republican, is clearly in position to limit access to the decision-making processes of the party in order best to promote the interests of the party's adherents. Just who they may be cannot accurately be determined even by the party itself, and it would seem, all the more clearly, that the problem is nonjusticiable because of the inability of the courts to define the party's constituency.

I have said enough to predicate my conclusion that the issue here is nonjusticiable.[17] On that ground, I would reverse the judgment of the District Court and order that the Ripon plaintiffs' complaint be dismissed. Even correctly to decide on the merits that the present Republican delegate-allocation formula is

---

ed table shows that there are to be 3,006 delegates authorized for the 1976 convention. The ten largest states including the nation's largest cities have been accorded 1,608 delegates. From those states, clearly enough, and reflecting past experience as to the sources of its voting strength, the Democratic Party has allocated those delegates thus:

| | | | |
|---|---|---|---|
| California | 279 | Ohio | 152 |
| New York | 274 | Texas | 130 |
| Pennsylvania | 178 | New Jersey | 108 |
| Illinois | 169 | Massachusetts | 104 |
| Michigan | 133 | Florida | 81 |

*See* The Washington Post, March 13, 1975, "Delegate Plan Outlined by Democrats."

**16.** *And see O'Brien v. Brown,* 409 U.S. 1, 4, 5, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972).

**17.** In *Baker v. Carr, supra,* 369 U.S. at 217, 82 S.Ct. 691, the Court summarized factors to be considered in a determination of nonjusticiability. Merely to hold that Republican Rule 30 violates no rights of the Ripon plaintiffs would seem not to preclude yet other challenges by other groups, irrespective of which of the major parties may be involved. *See* note 15, *supra,* where delegates from ten States will constitute more than a convention majority to the exclusion of the delegate strength of the other forty States.

A holding of nonjusticiability, on the other hand, would speak to all and make clear that a delegate-allocation plan, rationally evolved, and reflecting valid and constitutionally protected political objectives is beyond judicial modification. *Cf.,* Frankfurter, J., dissenting, *Baker v. Carr, supra,* 369 U.S. at 289, 82 S.Ct. 691.

impervious to successful challenge will conclude only this case. I think, absent racial or other invidious discrimination of constitutional dimension, that we should dispose of the instant type of challenge, once and for all.

TAMM, Circuit Judge, with whom Circuit Judge ROBB joins (concurring in the result):

I agree with the disposition the court reaches, but believe that we must directly confront preliminary issues which the majority passes over to reach the merits. Specifically, we should reassess the vitality of our previous holding of governmental action in this area and recognize the full impact of the justiciability problems.

I

Eight individual registered Republicans and the Ripon Society, Inc. (collectively referred to as Ripon) challenge the delegate apportionment plan, Rule 30, adopted by the 1972 Republican National Convention for the 1976 Convention, as violative of the equal protection guarantee of the fifth and fourteenth amendments. In order to apply these constitutional restraints against the Republican National Party and Committee (Republicans), Ripon must establish the presence of state or governmental action. To do so, Ripon principally relies upon two cases in this circuit which found the activities of the major political parties to constitute governmental action, *Georgia v. National Democratic Party,* 145 U.S. App.D.C. 102, 447 F.2d 1271, *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971), and *Bode v. National Democratic Party,* 146 U.S.App.D.C. 373, 452 F.2d 1302 (1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972). I was a member of the unanimous division in *Georgia,* where we stated that "in the absence of further explication by the Supreme Court on this point, we incline to the conclusion that the National Conven-

tions are not so divorced from the activities of the states in conducting presidential elections as to negate the existence of state action." 447 F.2d at 1276. I believe that further Supreme Court pronouncements in the area strongly indicate that this position is no longer tenable.

In *Georgia,* we reached our "inclination" on two grounds. The first, involving a three-step analysis, began with the postulate, drawn from the *Texas White Primary Cases,*[1] that the activities of state political parties constitute state action "insofar as those activities touch upon the machinery whereby *candidates* are nominated by the parties to seek election to local or national office." 447 F.2d at 1275. Our second premise was that "a state party's action in selecting *delegates* to its national convention is also invested with state action since the delegates' primary function is the nomination of candidates for the nation's highest offices." *Id.* This premise was grounded on the assumption that delegate-selection processes were imbued with the same quality of state action as candidate-nomination processes; while recognizing that courts had divided on the question, we found the analogy "a close and compelling one." Finally, we reasoned that if "the action of the individual state parties in selecting delegates to participate in the presidential-nominating process constitutes state action, the collective activity of all the states' delegates at the national convention can be no less readily classified as state action." *Id.*

Our second ground was derived from the states' responsibility to conduct elections, pursuant to article I, section 1, and the twelfth amendment. Since the "electorate's choice in the general election is effectively restricted to the nominees of the two [major] parties," the states, by placing the major parties' nominees' names on the ballot, have

---

1. *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); *Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927).

adopted this narrowing process as integrally related to their election procedures. Therefore, we opined, "every step in the nominating process—especially the crucial determination of how many delegate votes each state party is to be allotted—is as much a product of state action as if the states themselves were collectively to conduct such preliminary conventions."[2]

In *Bode,* the division followed the *Georgia* state action holding. 452 F.2d at 1304–05. Notably, in neither case did we accord plaintiffs relief. However, the following year, this court intervened in an internal Democratic Party dispute over challenges to the California and Illinois delegations to the 1972 convention. *Brown v. O'Brien,* 152 U.S.App.D.C. 157, 469 F.2d 563 (1972). The division had "no difficulty concluding that defendants' action against these delegates was state action," *id.* at 567, and found that the national parties' decisions to exclude certain delegates violated due process. Thereafter, the Supreme Court stayed our judgment. *O'Brien v. Brown,* 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972). In strong language, the Court noted its "grave doubts" as to the correctness of our action:

> We must also consider the absence of authority supporting the action of the Court of Appeals in intervening in the internal determinations of a national political party, on the eve of its convention, regarding the seating of delegates. No case is cited to us in which any federal court has undertaken to interject itself into the deliberative processes of a national political convention; no holding of this Court up to now gives support for judicial intervention in the circumstances presented here, involving as they do relationships of great delicacy that are essentially political in nature. Judicial intervention in this area traditionally has been approached with great cau-

tion and restraint. It has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-party disputes as to which delegates shall be seated. Thus, these cases involve claims of the power of the federal judiciary to review actions heretofore thought to lie in the control of political parties. Highly important questions are presented concerning justiciability, whether the action of the Credentials Committee is state action, and, if so, the reach of the Due Process Clause in this unique context. Vital rights of association guaranteed by the Constitution are also involved. While the Court is unwilling to undertake final resolution of the important constitutional questions presented without full briefing and argument and adequate opportunity for deliberation, we entertain grave doubts as to the action taken by the Court of Appeals.

*Id.* at 4–5, 92 S.Ct. at 2720 (footnote and citations omitted). One month later, Justice Rehnquist stayed an earlier district court holding granting relief in the case *sub judice,* based in part on "the probability of error in the result below," citing the above quoted passage from *O'Brien. Republican State Central Committee v. Ripon Society, Inc.,* 409 U.S. 1222, 1225–27, 93 S.Ct. 1475, 1477 (1972) (Rehnquist, Circuit Justice).

Thus, the Supreme Court has strongly suggested that if confronted with the issue, it would reverse our holding on state action. Ripon disputes this characterization and contends that the Court's criticism in *O'Brien* was aimed at the timing of our intervention and its focus on an internal party dispute, not the holding of state action. *See* Appellants' Memorandum pursuant to Order of March 19, 1975 at 14–15; Note, *Presidential Nominating Conventions: Party*

---

2. 447 F.2d at 1276 (footnote omitted). While recognizing that the Supreme Court opinions supporting this theory arose in one-party

states where nomination was tantamount to election, we did not believe that factor was enough to distinguish those cases.

*Rules, State Law and the Constitution,* 62 *Geo.L.J.* 1621, 1636–37 (1974). *Compare Cousins v. Wigoda,* 419 U.S. 477, 491, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) *with id.* at 494, 95 S.Ct. 541 (Rehnquist, J., concurring). However, we need not dispositively settle on one of these differing interpretations, for even assuming that *O'Brien* does not preclude reaffirmance of our *Georgia* holding, other Supreme Court precedent and analysis have so eroded the analytical underpinnings of both alternative holdings that I believe we are no longer justified in adhering to them.

## A

The first basis for our *Georgia* holding was that state political parties' activities concerning nomination of candidates constituted state action; we invoked the *White Primary Cases* to support this proposition. However, in *O'Brien,* the Court characterized those cases as involving claims of "invidious discrimination based on race in a primary contest within a single State." 409 U.S. at 4 n. 1, 92 S.Ct. at 2720 (citations omitted). That is a dramatically different proposition than we drew from those cases. Moreover, we have been criticized, perhaps justifiably, for citing the *White Primary Cases* indiscriminately, without distinguishing between those which turned on fifteenth amendment rights and those which were based on equal protection.

*See* Kester, *Constitutional Restrictions on Political Parties,* 60 *Va.L.Rev.* 735, 766 (1974). Upon further reflection, I think that the generalizations we culled from those cases rest on less than firm ground.

First, those cases all involved racial discrimination, a prime target of the fourteenth and fifteenth amendments, with the practical consequence that a lesser degree of involvement may trigger constitutional scrutiny. *See, e. g., Greenya v. George Washington University,* 167 U.S.App.D.C. 379, 512 F.2d 556, 560 (1975); *Jackson v. The Statler Foundation,* 496 F.2d 623, 628–29 (2d Cir. 1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975). No allegation of racial discrimination is at issue here. Second, the *White Primary Cases* all took place during a one-party era in Texas when nomination in reality was tantamount to election—the primary *was* the election. This is certainly not the situation at the national level.

Finally, the two *Nixon* cases involved state statutes which directly controlled the activity in question,[3] and *Allwright* and *Terry* were fifteenth amendment cases, involving the right to vote; because of the integral relation between the primary and election in the one-party state, the Court found a constitutional violation.[4] The appropriateness of invoking these cases in the case at bar becomes questionable as the importance

**3.** In *Nixon v. Herndon,* the Court struck down on equal protection grounds a Texas state statute explicitly barring blacks from participation in Democratic Party primary elections. 273 U.S. 536, 540–41, 47 S.Ct. 446, 71 L.Ed. 759 (1927). After that decision, Texas passed a statute granting every political party in the state "the power to prescribe the qualifications of its own members . . . to vote or otherwise participate in such political party . . . ." The Democratic Party adopted a "whites only" primary rule. The Court in *Nixon v. Condon* found that the power to determine qualifications derived from the statute, and the resolution excluding blacks was therefore state action in violation of the fourteenth amendment, 286 U.S. 75, 85–89, 52 S.Ct. 484, 76 L.Ed. 984 (1932).

**4.** In *Allwright,* primary eligibility had been determined by the party's convention. However, the Court in finding state action relied heavily on the state's detailed regulation of those primaries for its conclusion that the party was "an agency of the State in so far as it determines the participants in a primary election." 321 U.S. 649, 663, 64 S.Ct. 757, 765, 88 L.Ed. 987 (1944). In *Terry,* the Court, though split on the proper analysis, extended its fifteenth amendment holding to the whites-only Jaybird Democratic Association which conducted a straw-vote election prior to each Democratic primary, the winner of which invariably triumphed in the Democratic primary and general election. 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

of state authorizing statutes in the presidential nominating process appears tangential,[5] and as Rule 30 involves apportionment of delegates, not actual voting processes. Thus, the *White Primary Cases* are not strong authority for the general proposition we advanced in *Georgia.*

I also cannot extract a general rule from the other, arguably relevant, Supreme Court cases not directly relied upon in *Georgia—United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), and *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). *Classic* reversed the dismissal of an indictment against a state election official for falsely counting primary ballots on the basis that primaries were such an "integral part" of the election process that the constitutional right to vote extended to them. However, the *Classic* holding was firmly grounded in the article I protection of the right to vote in congressional elections, which also extends to private interferences, and thus cannot stand for the proposition that all nominating procedures closely related to general elections constitute state action. 313 U.S. at 314–15, 61 S.Ct. 1031, *see Developments in the Law—Elections,* 88 Harv.L.Rev. 1111, 1158–59 (1975). In *Gray,* the device attacked on equal protection grounds, the unit-voting system, was directly imposed on the Democratic Party by statute if it chose to hold a primary. The finding that this proximate regulation of the challenged device constituted state action is unsurprising, but is also doctrinal-

ly different than the question presented by Rule 30. 372 U.S. at 374–75, 83 S.Ct. 801; *see* Kester, *supra,* 60 *Va.L.Rev.* at 763; *Developments, supra,* 88 *Harv.L. Rev.* at 1158 n.41.

Moreover, as the Supreme Court has recently made clear, the mere fact that the state regulates some aspects of an organization does not make its activities state action. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 447 (1974); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). There must be a sufficient nexus between the challenged action and the state regulation. *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 351, 95 S.Ct. 449. Clearly no such nexus exists between any state statute and the allocation of delegates to the Republican Convention. This conclusion is underscored by *Cousins v. Wigoda, supra,* where the Court found that the "states themselves have no constitutionally mandated role in the great task of the selection of Presidential and Vice-Presidential candidates. If the qualifications and eligibility of delegates to National Political Party Conventions were left to state law '. . . each of the fifty states could establish the qualifications of its delegates to the various party conventions without regard to party policy, an obviously intolerable result.' "[6]

In sum, I must conclude that the first step that led to our conclusion that the decisions of national conventions were state action was an unjustified simplification inconsistent with present authori-

---

5. At last count, nineteen states provided by statute, in one form or another, for presidential primaries. Nineteen other states have statutes providing for state political conventions from which delegates to the National Conventions are chosen, leaving the selection of delegates to state party rules. Twelve states have no statute whatever on the subject. Republican Supp. Br. at 13 n.5. Thus, at best, the degree of state action should vary from state-to-state. Moreover, none of these statutes bear on the issue *sub judice,* the allo-

cation of delegates and whether that decision constitutes state action.

6. *Cousins v. Wigoda,* 419 U.S. 477, 489–90, 95 S.Ct. 541, 549, 42 L.Ed.2d 595 (1975) (footnote omitted), *citing Wigoda v. Cousins,* 342 F.Supp. 82, 86 (N.D.Ill.1972). The Court also noted recent proposals that the parties use regional or national primaries to choose these nominees. 419 U.S. at 490 n.9, 95 S.Ct. 541.

ty.[7] Without this syllogistic prerequisite, our first state action holding must fall.

### B

Our alternative state action holding was based on the electoral process itself. The linchpin in that argument is that the states, by adopting as a necessary adjunct of their election procedures the narrowing process performed by the parties through placing the party nominees' names on the ballot, have made the parties' activities their own. Since the *Georgia* decision, the Supreme Court has held that the states have a compelling interest in enforcing this narrowing process. *See American Party of Texas v. White,* 415 U.S. 767, 780–81, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Storer v. Brown,* 415 U.S. 724, 736, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). All of those cases, however, dealt with actions taken by the states themselves and were unaccompanied by any state action question.[8] In fact, the only relevant recent Supreme Court decisions point in a direction opposite to our *Georgia* conclusion.

In *Jackson v. Metropolitan Edison Co., supra,* petitioner challenged a utility's termination of a customer's service on due process grounds, alleging, *inter alia,* that state action was present because the termination had been performed pursuant to a tariff accepted by the state. The Court, rejecting this suggestion, found that "[a]pproval by [the state] . . . where [it had] not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the [state] into 'state action.'" 419 U.S. at 357, 95 S.Ct. at 457. The Court held that where the initiative comes from the private party no state action is present.

Similarly, every action taken by any individual which aids the state in its narrowing function cannot be deemed state action; the connection between the public and private entities must be more specific and direct. That connection is not present here. The nominating function is not one traditionally performed by the states, nor are they particularly interested in the mechanics of the nar-

---

7. *Cousins* also apparently undercuts the second step in our *Georgia* analysis—the analogy between delegate-selection processes and candidate-nomination processes. In disposing of the argument that Illinois was protecting its compelling interest in the electoral process, the Court stated:

> Consideration of the special function of delegates to such a Convention militates persuasively against the conclusion that the asserted interest constitutes a compelling state interest. Delegates perform a task of supreme importance to every citizen of the Nation regardless of their State of residence. The vital business of the Convention is the nomination of the Party's candidates for the offices of President and Vice President of the United States. To that end, the state political parties are "affiliated with a national party through acceptance of the national call to send state delegates to the national convention." *Ray v. Blair,* 343 U.S. 214, 225, 72 S.Ct. 654, 659, 96 L.Ed. 894 (1952).

419 U.S. at 489, 95 S.Ct. at 548. This singling out of convention delegates' "unique task" dissipates the strength of the analogy we relied upon in *Georgia. See also Smith v. State Exec. Comm.,* 288 F.Supp. 371, 374–76 (N.D.

Ga.1968); Note, *One Man, One Vote and Selection of Delegates to National Nominating Conventions,* 37 U.Chi.L.Rev. 536, 538–45 (1970); Note, *Constitutional Safeguards in the Selection of Delegates to Presidential Nominating Conventions,* 78 Yale L.J. 1228, 1232–35 (1969). *Cf. Lynch v. Torquato,* 343 F.2d 370 (3d Cir. 1965); *Irish v. Democratic-Farmer-Labor Party,* 287 F.Supp. 794, 802–03 (D.Minn.), aff'd, 399 F.2d 119 (8th Cir. 1968). *But see Maxey v. Washington State Democratic Comm.,* 319 F.Supp. 673 (W.D.Wash.1970).

*Cousins* also clouds the correctness of the third step in the *Georgia* analysis. If the states cannot enforce the results of their primaries, there is some question whether the acts of national conventions should be considered those of the states acting in concert.

8. The Court has also recognized that the states cannot constitutionally effectuate their interest in a manner which too rigidly restricts access to the ballot and electoral process. *See, e. g., Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

rowing process, so long as by the general election, the size and complexity of the ballot is within reason. Thus, it is impossible to conclude that the national conventions are performing a delegated governmental function. In fact, by adopting a platform and promulgating rules to govern their party and by choosing a standard bearer who best represents the party's ideologies and preferences, delegates are engaged in activities with which the first amendment bars most governmental interference. When this analysis is coupled with the *Cousins* holding that the state cannot enforce its supposed interests against the national party, I must conclude that the necessary integral relationship between Rule 30 and the states is lacking.[9]

The fact that neither of the *Georgia* holdings are now tenable does not end the state action analysis, since there is another possible source of governmental involvement in this area—the federal government. Recent years have seen the increasing regulatory and financial involvement by the federal government in the electoral process, culminating in the Federal Election Campaign Act Amendments of 1974, P.L. 93–443, 88 Stat. 1263.

Under the present version of federal regulations,[10] the major parties' conventions, starting in 1976, will probably be totally funded by federal funds. *See id.* at 1294, *as codified, Int.Rev.Code* of 1954 § 9008. While the argument could be made that this grant of federal money makes the actions of the convention subject to constitutional scrutiny, the circuit courts have held time and again that,

absent a finding of racial discrimination, the mere receipt of government funds is not enough to dictate that finding. *See, e. g., Greenya v. George Washington University, supra; Junior Chamber of Commerce v. Missouri State Junior Chamber of Commerce,* 508 F.2d 1031, 1033–34 (8th Cir. 1975); *Wahba v. New York University,* 492 F.2d 96 (2d Cir. 1974). There must be a sufficient nexus before the government can be considered a joint participant in the challenged activity. *See Moose Lodge No. 107 v. Irvis, supra; Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The funding of the conventions does not supply that joint participation in the case *sub judice,* since the funding is authorized regardless of the procedures the convention adopts.

Similarly, the federal regulatory presence is not sufficient to trigger a governmental action finding. The regulation, presently constituted, has no connection with the activities in question[11] and does not meet the level the Court in *Jackson* indicated is necessary for a finding of governmental action. Further, the regulation is not sufficiently detailed, nor are the benefits the federal government derives from the conventions' activities significant enough, so that we could find the existence of a symbiotic relationship or constitutionally recognizable "entanglement" between the entities. *Compare Howard University v. National Collegiate Athletic Ass'n,* 166 U.S.App.D.C. 260, 510 F.2d 213 (1975).

In summary, I must conclude that Ripon cannot demonstrate the presence of

---

9. It should also be noted that in many states, the national party nominee is placed on the ballot only after certification by the state party. *If* there is a constitutional violation in these procedures, it is not the certification, but the state's grant of automatic ballot access to the major parties' candidates. The remedy should not be to interfere with the associational activities of the national parties, but to deny their candidate the advantage in securing a place on the state's ballot. *See* Kester, *Constitutional Restrictions on Political Parties,* 60 Va.L.Rev. 735, 767 (1974).

10. The constitutionality of these provisions was upheld for the most part in *Buckley v. Valeo,* 171 U.S.App.D.C. 172, 519 F.2d 821 (1975) *(en banc), review granted,* —— U.S. ——, 96 S.Ct. 32, 46 L.Ed.2d 36, 44 U.S.L.W. 3178 (U.S. Oct. 6, 1975).

11. Of course, the associational interests identified in *Cousins* may preclude such regulation, a question explicitly left open by that opinion. 419 U.S. at 483 n.4, 95 S.Ct. 541.

governmental action in the adoption of Rule 30. Therefore, I must concede that our holding in *Georgia* was in error. The problem of "state action" has always been doctrinally a difficult and unsatisfying one; a commentator has called state action "a conceptual disaster area." [12] Recent Supreme Court decisions have, however, clarified the standards we must apply in this area, and those standards dictate the conclusion that I believe we must reach here.

By this conclusion I do not foreclose all possibility that an action taken by a major political party or its national convention will be judged to be subject to constitutional restraints; I endorse the evolving doctrine that in racial discrimination situations, a lesser quantum of governmental involvement will trigger constitutional scrutiny. In this situation, however, I would vote to reverse the judgment of the district court for lack of jurisdiction. Since the majority of this court avoids confronting this difficult question by assuming jurisdiction, I am compelled to turn now to another issue which requires scrutiny before consideration of the merits, and which the majority also glosses over—justiciability.

## II

"Justiciability is itself a concept of uncertain meaning and scope." *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968). It is "not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures . . . ." *Poe v. Ullman,* 367 U.S. 497, 508, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961). While its applicability to the so-called "political question doctrine" has been eroded, *see, e. g., Powell v. McCormick,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), there is no reason to assume its demise. *See Gilligan v. Morgan,* 413 U.S. 1, 11, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973).

Confronting the question of justiciability in *Georgia* of a claim similar to the one *sub judice,* we found judicial review appropriate because:

> courts are competent to scrutinize the allocation schemes promulgated by the national parties in order to determine whether, given the context of political partisanship out of which such formulas necessarily arise, substantial deviations from equality of voting power at the Conventions are supported by legitimate justifications.

447 F.2d at 1278 (footnote omitted). The passage of the Supreme Court's opinion in *O'Brien,* set out on page 4 *supra,* cited with approval by Mr. Justice Rehnquist in his *Ripon* opinion, casts doubt upon our justiciability holding. Upon reconsideration, I conclude that we have failed to face the import of the justiciability problems in this area.

In *Baker v. Carr, supra,* 369 U.S. at 217, 82 S.Ct. 691, the Court listed factors which would make a claim a non-justiciable political question; two of those factors expose directly the inherent difficulty in a court's reviewing a delegate allocation formula for national political conventions—the lack of judicially discoverable and manageable standards and the impossibility of reaching a decision without an initial policy determination of a kind clearly for non-judicial discretion.

### A. Lack of Judicially Discoverable and Manageable Standards

In *Georgia,* we opined that we could determine "substantial deviations from *equality of voting power*" (emphasis added); since we rejected plaintiff's claim in that case, we were never forced to define the test precisely. In fact, I am afraid that our *Georgia* test is more promise than reality and could never be applied accurately to a challenge to any delegate allocation formula.

First, it is impossible to define the constituency whose equality of voting power we are attempting to protect. None of the obvious possibilities is satis-

12. Black, *The Supreme Court—Foreward,* 81 *Harv.L.Rev.* 69, 95 (1967).

fying. The most obvious is the class of registered members of the particular party; however, at the national level, both parties to succeed must reach beyond these mostly dependable adherents to gain the temporary allegiance of the so-called independent vote. In fact, to force the Republican Party to define its constituency as its registered members would consign the party to minority status.

Using voting results is equally unsatisfying. As we recognized in *Bode* : "Elusive too is the utilization of past voting patterns—transitory political phenomena—to ascertain the current population to be represented at a national convention." 452 F.2d at 1307 (footnote omitted). The final possibility is to define the relevant constituency as all voters, but to impose that criterion on a party would be to deny it any ideological choice, a choice which lies at the heart of the party's first amendment associational freedoms. Thus, although the *Bode* division did not recognize the full implication of its analysis, its comments are apt: "the individual to be represented [is not] identifiable except in a loose, conceptual sense. . . . To identify and count potential Democrats is impossible, requiring desirable but unavailable clairvoyance." 452 F.2d at 1306–07.

The second undefinable standard is the determination of the basis against which a party's delegate allocation plan is to be tested, even assuming the relative constituency could be ascertained. "One man, one vote" principles, as our brethren concede, do not apply. The Court has held that those stringent standards bear only on bodies which exercise general governmental powers. *See, e. g., Salyer v. Tulare Lake Basin Water Storage District,* 410 U.S. 1719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973); *Hadley v. Junior College District,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

Without belaboring the point, nominating conventions do not meet this criterion. Neither the writing of platforms nor the nomination of candidates is a governmental function. A convention is not a representative body.[13] Delegates need not be elected. Once at the convention, subject to certain state statutes, instead of representing any constituency, they are "free agents," able to coalesce around any candidate or issue of their choosing. Finally, any representative role they may have can be completely undercut if the convention exercises its right not to seat them. *Cousins v. Wigoda, supra; cf. Zimmer v. McKeithen,* 485 F.2d 1297, 1304 n.15 (5th Cir. 1973) *(en banc). See also Education/Instruction, Inc. v. Moore,* 503 F.2d 1187 (2d Cir. 1974), *cert. denied,* 419 U.S. 1109, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975); *Davis v. American Telephone and Telegraph Co.,* 478 F.2d 1375 (2d Cir. 1973).

Hence, what this boils down to is: if the proper constituency could be determined, which it cannot satisfactorily, and if the basis for equality could be settled upon, which would not include one-man, one-vote principles, then perhaps the court could scrutinize "deviations" to ensure they are based upon "legitimate justification." However, even this inquiry is infeasible, since it involves the court in political policy determinations.

**B. *Policy Determinations Requiring Non-Judicial Discredit***

Political parties are formed for two major purposes—(1) to associate with people of like ideological persuasion and (2) to attempt to implement their ideological goals by electing candidates who share that objective. Both functions are protected under the first amendment. Their effectuation depends on a series of political choices made by its members.

In fact, it could fairly be said that a party's twin objectives of ideological pu-

---

13. One important difference is that, unlike an official elected to a governmental body, a delegate selected to attend a national convention apparently cannot force that body to seat him.

*Compare Powell v. McCormick,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), *with Cousins v. Wigoda, supra* note 6.

rity and electoral success are often incompatible and that a party must strike a compromise between both goals or opt for one at the expense of the other. For example, the results of the 1972 Democratic and 1964 Republican Presidential campaigns may be partially explained by the parties' decision to seek ideological purity at the expense of electoral attractiveness.

Judge McGowan's opinion advances some of the justification and political choices which underlie the bonus systems attacked by the plaintiffs in this case. The crucial point is that all these potential decisions—whether to reward the ideological faithful, farmer or urban dweller or whether to encourage electoral success by rewarding those local parties which actually carry the ticket—are essentially political accommodations. As such, they are a fundamental exercise of first amendment rights; second-guessing of their accuracy by the judiciary is both impossible and an unwarranted deviation from our constitutional scheme.

Moreover, there already exists a correcting mechanism in the system—the ballot box. So long as political parties exist to elect candidates and effectuate programs, they will never be overly exclusionary too long. The judiciary need not and should not paternalistically interfere with this process.[14]

This posture of non-interference has been followed by courts hearing claims involving party affairs. The Eighth Circuit, declining to reapportion the Minnesota delegates to the Democratic National Convention, found the case to be a non-justiciable political question. *Irish v. Democratic-Farmer-Labor Party,* 399 F.2d 119, 121 (8th Cir. 1968). Similarly, the district court in *Smith v. State Executive Committee,* 288 F.Supp. 371, 376 (N.D.Ga.1968) denied relief, *inter alia,* on the basis that "there is no known case to the effect that any jurisdiction exists over the internal rules or management of a political party." Finally, the Third Circuit, in recently reversing a district court decree enjoining a state party's delegate allocation to its party convention, stated:

> If a given party chooses to organize by districts, but to allocate delegate strength to a district in which it has fewer numbers but a greater opportunity to achieve the practical advancement of the political ideas for the pursuit of which the association was formed, state action which frustrates that choice is highly suspect.

*Redfearn v. Delaware Republican State Comm.,* 502 F.2d 1123, 1127–28 (3d Cir. 1974). *See also Lynch v. Torquato,* 343 F.2d 370 (3d Cir. 1965).

I would concur in those assessments and conclude that the question plaintiffs present is non-justiciable.[15]

## III

I have no quarrel with the majority opinion on the merits. Were I to reach them, I would find Judge McGowan's opinion both attractive and persuasive. However, despite the best attempts to deter further litigation, I fear that by "reserving" the questions of state action and justiciability, the majority make

---

14. A caveat—this case does not concern invidious exclusion, such as race, alienage or national origin. Such a case might change both the previously discussed state action analysis and the appropriateness of judicial interference. However, we intimate no views concerning the ultimate disposition of such a case without the benefit of a concrete factual context before us.

15. In *Georgia,* we also took note of a lesser justiciability test from *Baker v. Carr:*

> Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to the courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, *that a discrimination reflects no policy, but simply arbitrary and capricious action.*

447 F.2d at 1277, *citing* 369 U.S. at 226, 82 S.Ct. 691. If state action were shown, I agree that we could scrutinize even delegate allocation schemes for totally arbitrary action. However, plaintiffs do not, as they clearly cannot, make that claim, but argue that the deviations are not legitimately justifiable. That claim is non-justiciable under *Baker.*

such litigation inevitable. For my part, since I find the requisite state action necessary for plaintiff's jurisdiction lacking, I would rest our decision on that, more conclusively final, ground. I, therefore, concur in the result of reversing the district court with directions to dismiss the complaint.

WILKEY, Circuit Judge, with whom joined Senior Circuit Judge DANAHER (concurring in the result only.)

Although we are in agreement that the judgment of the District Court must be reversed insofar as it grants appellants relief, we would reach that result on the threshold issues of "state action" and "justiciability" and not on the merits of appellants' claims. We recognize that this court in 1971 held in *Georgia v. National Democratic Party*[1] that the allocation of delegates by a national political convention was "state action" within the meaning of the Fourteenth Amendment and represented a justiciable controversy, and that those holdings were reaffirmed shortly thereafter in *Bode v. National Democratic Party.*[2]

In the interim since, however, the Supreme Court in *O'Brien v. Brown*[3] expressed "grave doubts" about our disposition of an analogous case dealing with seating of delegates at the 1972 Democratic National Convention. A stay, issued by Mr. Justice Rehnquist in his capacity as Circuit Justice, dealing with the allocation plan presently before us,

also called into question our opinions in *Georgia* and *Bode.*[4] As a result, a reassessment of our prior opinions is definitely in order.

Aside from concern as to the substantive correctness of our previous views, we find the majority's refusal to consider and resolve in this *en banc* proceeding the state action and justiciability issues posed by this case to be unwise judicial policy. By failing to resolve these issues in a case brought sufficiently in advance of the 1976 national conventions to permit adequate deliberation, we doubtless will face the unenviable task of resolving these questions on the eve of a national convention under time constraints and other pressures that would make reasoned deliberation difficult, if not impossible.

## I. *State Action*

The initial threshold question posed by this challenge is whether there was sufficient governmental involvement in the allocation of delegates to the 1976 Republican National Convention to trigger application of the equal protection guarantees of the Fifth and Fourteenth Amendments.

In our opinion in *Georgia v. National Democratic Party* we relied on two rationales for our conclusion that the allocation of delegates by a national political party constituted "state action." The first rationale involved a three-part syl-

---

1. 145 U.S.App.D.C. 102, 447 F.2d 1271, *cert. denied,* 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971).

2. 146 U.S.App.D.C. 373, 452 F.2d 1302 (1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972).

3. 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972). The Supreme Court has also in the interim decided the cases of *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), and *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). In the former case the Court held that the termination of service by a heavily regulated utility with something approaching monopoly power was not state action, absent some actual connection between

the state and the termination of service. In the latter case the Court held that the refusal of a private club to serve a black guest at its dining room and bar did not constitute "state action" despite the fact that the state licensed the club to serve liquor and regulated the club in some particulars unrelated to the discriminatory practices. These two cases are arguably distinguishable on their facts, but their thrust does reinforce our conclusion, developed independently, that the states are not sufficiently involved in the actions of the national political conventions.

4. *Republican State Central Committee of Arizona v. Ripon Society, Inc.,* Application for Stay, 409 U.S. 1222, 93 S.Ct. 1475, 34 L.Ed.2d 717 (1972).

**606**

logism.[5] First, we noted that "state action" inheres in the participation of state parties in candidate nomination by state-wide primary election. In support of this proposition reliance was placed upon the Texas White Primary line of cases [6] and the more recent Supreme Court opinion in *Gray v. Sanders*.[7] Given the premise, we said secondly that the state party's action in selecting delegates to its national convention is also invested with "state action," since the delegates' primary function is to nominate candidates for the two national offices. Finally, if the activity of individual state parties in selecting delegates to participate in the nomination process is "state action," the collective decisions made by all these delegates once assembled must constitute "state action."

Our second basis in *Georgia* for finding "state action" was derived from the fact that most, if not all, states utilize the national political conventions in order to limit the electorate's choice in the general election,[8] *i. e.,* the narrowing process. The party nominating process was thus thought to be state action either (1) because the parties by engaging in the narrowing process are undertaking a governmental task akin to conducting a primary election, or (2) because the states ratify the result of the convention through the automatic placement of its nominees on the general election ballot.

The opinion in *Bode* merely reasserted the conclusions reached in *Georgia* that any "decision made by the Democratic Party at the national level . . . is tantamount to a decision of the States acting in concert . . . ."[9]

In view of the Supreme Court's recent pronouncements, we are now of the view that the rationales articulated in *Georgia* and followed in *Bode* were incorrect, and that the actions of the national political conventions *per se* are not sufficiently infused with state involvement to trigger constitutional protections except in the context of racial or other invidious discrimination.[10]

Our primary difficulty with the first ground of the *Georgia* opinion focuses upon the jump between premise two and the conclusion. Even if it be conceded *arguendo* that "the state's *delegate*-selection processes are imbued with the same quality of state action found in *candidate*-nomination processes . . . ,"[11] it does not follow that the actions of delegates selected at such elections are "state action" merely because they were chosen at a primary which is subject to constitutional constraints.

Party participation in the electoral process is subject to constitutional safeguards because *that* process is permeated by state regulation. In *Gray v. Sanders,* for example, the Court held the Georgia Democratic primary election to be subject to an equal protection attack because Georgia "collaborates in the con-

5. 145 U.S.App.D.C. at 105–06, 447 F.2d at 1274–75.

6. *Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927); *Nixon v. Condon,* 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932); *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

7. 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

8. 145 U.S.App.D.C. at 107, 447 F.2d at 1276.

9. 146 U.S.App.D.C. at 375, 452 F.2d at 1304.

10. As we indicated earlier in *Greenya v. George Washington University,* 167 U.S.App.

D.C. 379, 383, 512 F.2d 556, 560 (1975), we are in agreement with Judge Friendly that racial and other invidious discrimination is peculiarly offensive to the Fourteenth Amendment, hence a lesser degree of state involvement may constitute "state action" in that context. Although we are not faced with such a case here, we specifically note that our views on "state action" might well be different if the issue arose in a case presenting a claim of discrimination on the basis of race, religion, national origin, or sex. *Accord, Weise v. Syracuse University,* 522 F.2d 397, 405–407 (2nd Cir. 1975).

11. 145 U.S.App.D.C. at 106, 447 F.2d at 1275 (emphasis in original).

duct of the primary, and puts its power behind the rules of the party." [12]

The actions of a national political convention or committee are distinguishable because they are not similarly permeated by governmental involvement or regulation. There is no law, state or federal, *requiring* a national party political convention. Neither the Federal Government nor any of the States seek to dictate the manner in which a national political convention adopts its platform or its nominees.[13] Similarly, there is no governmental involvement at all with the delegate allocation process. The *formula* here under review was purely the product of party deliberations and actions and was neither compelled, restricted, modified, devised, or encouraged by any state statute or ordinance. The national party decision being challenged in this case is thus not "in reality, the decisions of the states acting in concert." [14] It is rather private action by party delegates and officials. They may have been selected by a process that was sufficiently regulated by a state government to call into play constitutional restrictions at the selection stage. However, this connection alone is simply too tenuous to trigger the Equal Protection Clause.

Turning to the second ground advanced in the *Georgia* opinion, we question both the premise and conclusion. There can be no doubt that as a historical matter the nominees of the Republican and Democratic parties have had a monopoly on national office since 1852. Whether their monopoly will continue into the future has been questioned by some [15] and is not particularly material for present purposes, because if that monopoly continues it will not be the result of governmental action. The recent *Ballot Access Cases* of the Supreme Court have recognized compelling state interests in limiting party and candidate access to the ballot.[16] However, they have also recognized that the states are not permitted to freeze in the two major parties nor set down requirements that so burden access by independent candidates and new parties that they would not be permitted ballot access despite significant public support.[17] We are thus led to conclude that if the Republicans and Democrats continue to dominate Presidential politics it will be because the vast majority of the voters will continue to feel that the nominees of those parties deserve their support and their votes, and not because state election laws maintain them in power.

Each major (or minor) party is free to adopt whatever scheme it desires—convention, national primary, or lottery—in the selection of its candidates for national office. That the states utilize the national party convention choices as the party nominees to go on the ballot, instead of requiring a petition or other device, does not retroactively transmute

---

**12.** 372 U.S. 368, 374, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), *quoting from Chapman v. King,* 154 F.2d 460, 464 (5th Cir.), *cert. denied,* 327 U.S. 800, 66 S.Ct. 905, 90 L.Ed. 1025 (1946).

**13.** It is, in fact, doubtful that any such scheme of state or federal regulation would be constitutional. In view of the First Amendment associational rights involved, governmental regulation could only be in furtherance of a compelling interest and even then would have to be tailored to be least restrictive of the associational rights involved. *Compare Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975).

**14.** 145 U.S.App.D.C. at 106, 447 F.2d at 1275.

**15.** *See, e. g.,* D. Broder, *The Party's Over* (1971).

**16.** *American Party of Texas v. White,* 415 U.S. 767, 782 n. 14, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974).

**17.** *Williams v. Rhodes,* 393 U.S. 23, 32, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) ("The fact is, however, that the Ohio system does not merely favor a 'two-party system'; it favors two particular parties—the Republicans and the Democrats—and in effect tends to give them a complete monopoly."); *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). Cf. *Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (exclusion of an indigent from the ballot because of an inability to pay a fixed fee).

the national convention nominating process into state action. In *Jackson v. Metropolitan Edison Co.,*[18] where the state had accepted a tariff filing by the utility containing a proviso for termination of service without a hearing, the court concluded that approval by the state of the regulated utility's privately selected termination procedure did not "transmute a practice initiated by the utility and approved by the Commission into 'state action.'"[19]

Neither state nor federal government has ordered any political party to hold a national convention, nor prescribed the method of selection or allocation of delegates to be employed in 1976. The Republican National Committee's chosen method of allocation is a purely private choice. "[E]xercise of the choice allowed by state law where the initiative comes from it and not the State, does not make its action in doing so 'state action' for the purposes of the Fourteenth Amendment,"[20] so held the *Jackson* Court.

Whatever the states' interest in narrowing the field of Presidential candidates, it by no means logically follows that the narrowing process thus becomes a state *function.* The function is performed by private parties on their own initiative, and for their own purposes. The constitutional right of association protects the parties and persons involved in so doing. While not deciding specifically the issue of delegate allocation, the Supreme Court in *Cousins v. Wigoda*[21] made it abundantly clear that the individual states are powerless to impose their will on a national party nominating convention in any manner that would interfere with the almost unfettered discretion of the parties in naming candidates.

Feeble indeed is the "state function" which no state has the power to control. Thus would seem to perish the claim that the Republican National Convention's allocation of delegates is in any way a "state function."

We would reject—had it been offered—any claim that the recent amendment to the Internal Revenue Code[22] as to federal financing of national political conventions has imported an element of governmental involvement. Rather, considering the financing scheme *alone,* we deem our recent opinion in *Greenya v. George Washington University*[23] to be controlling. After reviewing the cases discussing this issue and the relevant arguments, the court concluded that "[w]ith the possible exception of racial discrimination by recipients of government funding, . . . mere financial support for particular projects also represents insufficient government involvement [to entail application of First or Fifth Amendment guarantees]."[24]

Considering the financing scheme cumulatively along with the other elements of government involvement previously discussed does not require a different result. Those other possible aspects of government involvement all emanate from the states and therefore cannot simply be added to federal financing to change the private character of the conventions. The Congress has sought to exercise no control over the conventions' governance or deliberations, hence there is no nexus between the complaint of plaintiffs, malapportionment of delegates, and the financing arrangement. The Congress would be quite surprised to learn that federal financial support had the effect of changing the conventions into governmental entities.

---

**18.** 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

**19.** 419 U.S. at 357, 95 S.Ct. at 457.

**20.** *Ibid.*

**21.** 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975).

**22.** Federal Election Campaign Act Amendments of 1974, Pub.L. No. 93–443, § 406, *to be codified as* Int.Rev.Code of 1954, § 9008.

**23.** 512 F.2d 556 (1975).

**24.** *Id.* at 560.

In addition, there are countervailing associational rights that must be considered in drawing the "state action" threshold. "The right of members of a political party to gather in a national political convention in order to formulate proposed programs and nominate candidates for political office is at the very heart of the freedom of assembly and association which has been established in earlier cases decided by the Court." [25] As a result, courts should be reluctant to subject the conventions to constitutional restraints. Such a reluctance reinforces our conclusion that there is no "state action" involved when the political parties apportion their convention delegates.

## II. *Justiciability*

The second threshold issue posed by this case is whether a challenge to the formula by which a national political convention allocates its delegates among the various states presents a nonjusticiable "political question." As with a finding of insufficient "state action," a finding of nonjusticiability here obviates the necessity—indeed, the propriety—of deciding the merits of plaintiffs' claims.

In an earlier phase of this case Ripon Society obtained in the District Court an injunction against the use by the Republican Party of the "bonus" formula for allocation of delegates to the party's 1972 convention.[26] That injunction was stayed by Mr. Justice Rehnquist on the ground of, *inter alia,* "the probability of error in the result below." [27] He based his reasoning on the following passage from *O'Brien v. Brown* : [28]

No case is cited to us in which any federal court has undertaken to interject itself into the deliberative process of a national political convention; no

holding of this Court up to now gives support for judicial intervention in the circumstances presented here, involving as they do, relationships of great delicacy that are essentially political in nature. [Citation omitted] Judicial intervention in this area traditionally has been approached with great caution and restraint. [Citations omitted] It has been understood since our national political parties first came into being as voluntary associations of individuals that the convention itself is the proper forum for determining intra-party disputes as to which delegates shall be seated. Thus, these cases involve claims of the power of the federal judiciary to review actions heretofore thought to lie in the control of political parties. *Highly important questions are presented concerning justiciability, whether the action of the Credentials Committee is state action,* and if so the reach of the Due Process Clause in this context. *Vital rights of association guaranteed by the Constitution are also involved. . . .* [W]e entertain grave doubts as to the action taken by the Court of Appeals.[29] (Emphasis added.)

*O'Brien* did not involve the question of the overall apportionment of delegates to a party convention; rather, the issue was which of two rival slates of delegates from one state should be seated. Nevertheless, in *Republican State Central Committee of Arizona v. Ripon Society, Inc.,*[30] Justice Rehnquist was undoubtedly correct in his perception that there is little practical or legal difference between judicial interference with a party's seating of delegates at the time of the convention and its apportionment of delegates prior to the convention. Both

**25.** *Cousins v. Wigoda,* 419 U.S. 477, 491, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) (Rehnquist, J., concurring).

**26.** *Ripon Society, Inc. v. National Republican Party,* 343 F.Supp. 168 (D.D.C.1972).

**27.** *Republican State Central Comm. of Arizona v. Ripon Society, Inc.,* 409 U.S. 1222, 1225, 93 S.Ct. 1475, 34 L.Ed.2d 717 (1972).

**28.** 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972).

**29.** *Id.* at 4–5, 92 S.Ct. 2718, quoted in 409 U.S. at 1226–27, 93 S.Ct. at 1478.

**30.** 409 U.S. 1222, 93 S.Ct. 1475, 34 L.Ed.2d 717 (1972).

are highly political questions, and their answers lie at the core of how the party perceives itself now and how it would like to present itself in the future.

Any doubt as to the importance the Supreme Court attaches to the freedom of a party convention to determine its own composition was put to rest recently in *Cousins v. Wigoda*.[31] Relying heavily on the freedom of association of individuals in the political decisionmaking process, the Court held that a state had no power to dictate to a party which delegates it should take from that state—regardless of the fact that the slate chosen by the convention had not been sanctioned in accordance with state law. Central to the Court's decision was the recognition that a party's choice of its associates in large measure molds its political beliefs and ideas.[32] This is particularly true of the party's quadrennial convention. What the convention decides—not only as to Presidential and Vice-Presidential nominees, but also as to party organization and ideology for the next four years—is primarily determined by who is permitted by the party to come to it.

Political parties are formed for the purpose of advancing certain commonly held ideas of individuals. These individuals have always enjoyed the right to structure the party in such a way as to seek to insure that those ideas should be perpetuated. A critical factor in this structuring process is the determination of which elements of the electorate as a whole are or could be most receptive to the party's viewpoint and programs. If the party, for example, were to decide that only individuals in rural areas can sympathize with its platform and determines to accept delegates only from such regions, clearly the party cannot be forced to accept delegates from urban areas as well without suffering a gross infringement of its right of free expression and association. As a matter of political influence—indeed, of political

survival—it might well be suicidal for the party to shut out urban opinion from its deliberations on candidates and platform; but certainly no decision is more personal to the party and less appropriate for judicial interference than its choice of maintaining ideological purity at the possible cost of minimizing political effectiveness.

The direction—the nominees and the platform—the party takes at a convention is in large measure a function of whom it allows as delegates. From a constitutional perspective, the judiciary can no more prescribe the composition of the convention than it can dictate the make-up of the party, its political beliefs as stated in the platform, or its nominees.

At the same time, it is important to note that, at least in this country, most political parties are not content simply to profess a particular ideological bent. They want to win elections as well. If the political decisions they make—as to candidates, platforms, and delegate apportionment—are not vindicated at the polls, they are likely to amend their posture in an endeavor to achieve more satisfactory electoral results. To the extent that a party fails to represent the "people's choice," therefore, the party itself can be expected to remedy the situation. If it does not, other parties will be quick to capitalize on its error. In short, the electoral process makes the parties largely self-regulatory; their errors as to the will of the majority are largely self-corrective.

This does not mean, of course, that every political party will, or should, attempt to represent every interest in American society, or even every interest within the party itself. It may well be that in its zeal to appeal to a large cross-section of the populace the party will lose the support of that segment which in the past has given it its most loyal backing. Also, its ideological position may become so homogenized that the

---

**31.** 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975).

**32.** *Id.* at 487, 95 S.Ct. 541.

public loses confidence in the party's political integrity. If the party tries to stand for everything, it may wind up standing for nothing in the public mind. The questions of how far the party can afford to spread its ideology and of where its best support lies in the populace are archetypally political in nature. The courts have absolutely *no standards* —even assuming they have the right—to make such decisions.[33]

At least two of the formulations of the "political question" doctrine laid down by the Supreme Court in *Baker v. Carr*[34] are directly pertinent to this case. One bars entertainment of a suit if the court finds "a lack of judicially discoverable and manageable standards for resolving [the controversy]."[35] The other, closely related, formulation requires the court to stay its hand when faced with "the impossibility of deciding [the controversy] without an initial policy determination of a kind clearly for nonjudicial discretion."[36] Although troubled by the problem, this court in *Georgia* found a "manageable standard" for review of the Democratic Party's delegate allocation formula in the "one man, one vote" requirement of the reapportionment decisions.[37] We concluded:

> The principle which renders the questions raised in this litigation justiciable is that courts are competent to scrutinize the allocation schemes promulgated by the national parties in order to determine whether, given the context of political partisanship out of which such formulas necessarily arise,

substantial deviations from equality of voting power at the Conventions are supported by legitimate justifications.[38]

This conclusion was cited and found determinative of the justiciability issue in *Bode* as well.[39]

Our decisions in *Georgia* and *Bode* were not reached without considerable pondering of the Supreme Court's then current development of the "one man, one vote" doctrine. In the interim since the Court has illuminated in those cases discussed above[40] issues which are much closer and therefore much more determinative of the issues we face here. Reflecting on these most recent Supreme Court pronouncements, it is apparent that our analysis in *Georgia* and *Bode* is inconsistent therewith.

The errors of our previous position would seem to be two. First, that the "one man, one vote" principle developed in reapportionment cases can have no application to a body which is neither elective nor representative, and which does not exercise general governmental powers. Second, even assuming a possible analogy between a legislature and a political party's nominating convention, it is impossible meaningfully to define and identify the constituency each delegate purportedly represents. These twin logical failings of the *Georgia* rationale should not, we submit, be allowed to resist analysis in yet another of this Circuit's delegate apportionment decisions. They are dealt with in turn below.

---

33. Nevertheless, this court found in both *Georgia* and *Bode* that the judiciary was fully empowered to exercise oversight with regard to the delegate allocation formulas of political party nominating conventions. We did not feel at that time, prior to the Supreme Court's decisions in *O'Brien* and *Cousins v. Wigoda*, that nonjusticiability presented a bar to our intervention in such intra-party decisionmaking.

34. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

35. *Id.* at 217, 82 S.Ct. at 710.

36. *Ibid.*

37. 145 U.S.App.D.C. 102, 108–09, 447 F.2d 1271, 1277–78 (1971).

38. *Id.* at 109, 447 F.2d at 1278.

39. 146 U.S.App.D.C. 373, 376, 452 F.2d 1302, 1305 (1971).

40. *Cousins v. Wigoda*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975); *O'Brien v. Brown*, 409 U.S. 1, 92 S.Ct. 2718, 34 L.Ed.2d 1 (1972).

## A. The Non-Governmental, Non-Representative Nature of a Political Party Convention

The Supreme Court has repeatedly emphasized, in one reapportionment case after another, that the principle of "one man, one vote" applies only to units of government which are representative in nature and exercise general governmental powers.[41] If the government unit has a very limited function and its members are not accountable to particular constituencies for their decisions, the "malapportionment" of the members does no offense to the Constitution.[42]

Political party nominating conventions meet neither of the criteria for application of the "one man, one vote" principle. In the first place, not only do they not exercise general governmental powers, but, as discussed in Part I above, they are not a unit of government at all. It may well be that the convention serves an important societal interest in winnowing out some candidates and thereby reducing the number who appear on the ballot at the general election; but the incidental performance of a public benefit by a private association does not render its activity "state action." Even assuming the possibility of ascribing a governmental function to a political convention, the analogy would be much closer to a special purpose unit which does not exercise normal governmental powers over the citizenry (and whose acts have disproportionate effects on different segments of the community) than to a legislature or other body with more generalized governmental authority.[43]

Second, and equally important, a political convention is not a representative body. Delegates need not be, and usually are not, elected to their positions.[44] They are not bound to vote for any candidate and do exercise their own discretion, based partially on occurrences subsequent to their selection and often on happenings at the convention itself. Even in the minority of states where delegates are elected or selected as the by-product of a Presidential primary, the delegate is only morally bound on a limited number of ballots to stick by a particular candidate. Furthermore, as *Cousins v. Wigoda* made clear, the convention is free to reject any individual delegate or slate of delegates—regardless of the method by which they were selected or elected—which does not meet with the convention's approval.

Thus, the delegate to a convention is not comparable to a representative in a legislature. A representative has a right to compel the legislature to seat him.[45] If he is not seated, the citizens of his state or district are effectively disenfranchised. In contrast, these same citizens enjoy no legal right to be represented at a political convention. They have no right, therefore, to insist on particular delegates, or to demand that those delegates vote in accordance with their wishes. To force a national convention involuntarily to accept delegates of a particular state's choosing would be in direct contravention of each delegate's and the party's right of free association.

To be sure, the major parties at present accept delegations from every state to their national conventions. Moreover, the delegates can be expected

---

**41.** *See, e. g., Salyer Land Co. v. Tulare Lake Basin Water Storage District,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973); *Hadley v. Junior College District,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970); *Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968); *Sailors v. Board of Education,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967).

**42.** *Id.*

**43.** *See Salyer Land Co. v. Tulare Lake Basin Water Storage District,* 410 U.S. 719, 728–29, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973).

**44.** *See Developments in the Law—Election Law,* 88 Harv.L.Rev. 1111, 1153–54 (1975).

**45.** *See Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

to make known to the convention the political views of actual and potential party adherents in their respective states. Indeed, the course of reform within the Democratic Party in recent years evidences the party's decision to become "more open," to encourage greater "grass roots" participation, and to make its conventions theoretically more representative of the will of its "constituency." [46] This decision by the Democrats, however, was a *political* choice, borne of what the convention perceived was in the party's political self-interest. If that decision, in the view of succeeding conventions, is determined to have injected too much divisiveness and factionalism within the party, the party is free to rescind it.

So, in the case at bar, if the Republican Party has made the political choice to invite larger delegations from the western and southern states, or from states which have traditionally voted Republican, it may be because the party believes that is the way to keep its organization in those states strong, or because it feels an obligation to reward those states for past allegiance, or because it feels delegates from those states are more likely to be of the proper ideological bent. Regardless of its reasoning, or of its sagacity, that decision is for the Republican National Convention alone to make—not for one faction within the party which was unable to persuade the convention of the merit of its position, and not for the courts.

The judiciary has neither standards by which to make the decision nor the right to make the kinds of sensitive policy determinations which are required.

### B. *The Unidentifiable Nature of a Political Party's "Constituency"*

Even assuming the possibility of drawing an analogy between the apportionment of representatives in a legislature and the allocation of delegates to a convention, the "one man, one vote" standard is well nigh impossible to apply in this situation. That standard depends on identifying the "man" whose "vote" is to be given equal weight with that of some other man. The reapportionment decisions use population as their criterion, and, not surprisingly, in *Georgia* the delegate apportionment plan was challenged on the ground that it failed strictly to conform to the relative population of the states. We correctly rejected that argument, noting that a convention delegate, unlike an elected official, does not represent the population as a whole, but a constituency which is ". . . significantly smaller than the whole of the electorate, and varies dramatically from state to state and from election to election." [47]

Inevitably, in *Bode* we were faced with the argument that the only acceptable criterion for allocating delegates was that of party strength in a state—as demonstrated by the average of the number of votes cast for the Democratic Presidential nominee in the three immediately preceding Presidential elections. We correctly rejected that argument as well, with the following analysis:

Nor is the individual to be represented identifiable except in a loose, conceptual sense. Appellees would define such individual as one who cast an anonymous vote for the Democratic Presidential candidate in an earlier year. It seems to us that the constituency represented at a national convention does not comprise solely "Democrats," so defined. To the extent that a voter, whether he be a registered Democrat or a Republican, third party adherent or independent, is given alternative slates by the two major parties, he has a stake in the outcome of

**46.** *See generally* A. Bickel, Reform and Continuity, The Electoral College, the Convention, and the Party System (1973); Note *Presidential Nominating Conventions: Party Rules, State Law and the Constitution,* 62 Geo.L.J. 1621, 1621–22 n. 5, 1627 nn. 30–31; *Riddell v.*

*National Democratic Party,* 344 F.Supp. 908, 918, 921 (S.D. Miss.1972).

**47.** 145 U.S.App.D.C. 102, 110, 447 F.2d 1271, 1279 (1971).

the nominating process of both parties. *Accordingly, the constituency for a national convention comprises to a certain degree the entire electorate.* By viewing the constituency of the Democratic National Convention in this way, the application of appellees' theory—that the allocation of delegates must be based on past performance—could theoretically result in a failure to represent, or at best, in an underrepresentation, of those who might wish to nominate and vote for a nominee different from the one ultimately selected at the convention. *To identify and count potential Democrats is impossible, requiring desirable but unavailable clairvoyance. Elusive too is the utilization of past voting patterns—transitory political phenomena—to ascertain the current population to be represented at a national convention.*[48] (Emphasis added.)

Added to the logical and practical bankruptcy of the "party strength" argument is the fact that in fifteen states there is no voter registration by party—a possible alternative means of determining the party's "constituency"—and in other states the lists are outdated.[49] Moreover, many voters register as "independents" in order to avoid being tagged with the label of one party or another. Finally, even registered "party members" have no duties or obligations toward the party; they may alter their membership at will. Even those who retain their membership cannot be compelled either to contribute financially to the party or display loyalty at the polls.

If neither population nor party strength can be relied upon to provide a "judicially manageable and discoverable standard" for deciding the question of delegate allocation, what possible standard remains? Certainly no combination of the two provides any more stable constitutional footing than each standing alone. Our inability to formulate a viable standard in *Georgia* or *Bode,* the refusal of the panel in the vacated opinion in the instant case to set down any clear guidelines, and the failure of the majority of this court *en banc* to identify the touchstone by which it has ratified the allocation plan challenged here, leads us to the conclusion that no authoritative standard exists. The absence of a judicially cognizable criterion for determining the "proper" allocation of delegates to a political convention dictates that the courts must refuse to intervene in disputes between intra-party factions over such allocation. The decision must be left to the internal decisionmaking machinery of each individual party.

*Conclusion*

The majority today sidesteps the issues of state action and justiciability at the potential cost of continued disruptive litigation over the private, political decisions of national party conventions as to their future membership. This manifests a strange intent to keep this court open for the business of directing the proceedings of national political conventions—of which there may be a surfeit in 1976—in spite of the fact that the Supreme Court has all but told us such business is none of our business.

The determination of what formula to employ in allocating delegates involves delicate questions of how best "to achieve the practical advancement of the political ideas for the pursuit of which the [party] was formed."[50] It is a question intensely personal to the party, involving not only the exercise of its members' constitutional right to free association, but also political, strategic, and ideological considerations which are manifestly inappropriate for the courts. We concur in the result reached by the majority, but register our strong disagreement with their decision to avoid the decisive threshold issues in this case.

**48.** 146 U.S.App.D.C. 373, 377–78, 452 F.2d 1302, 1306–07 (1971).

**49.** Appellants' Br. at 28.

**50.** *Redfearn v. Delaware Republican State Comm.,* 502 F.2d 1123, 1127–28 (3rd Cir. 1974).

BAZELON, Chief Judge (dissenting):

I remain convinced by the arguments advanced in the majority opinion of the division that first heard this appeal.[1] The Ripon Society has provided us on rehearing with ample factual data to support the tentative conclusions in Part I of the division's opinion that the so-called "victory bonus" results in a very substantial deviation from the one-per-son-one-vote norm.[2] While I adhere to previously stated views, several statements in the various opinions rendered by members of this court deserve critical comment; the purpose of this dissenting opinion is to offer such comment in defense of the majority opinion of the division.

## I. *Standing*

The rather incredible assertion is made that the Ripon Society may lack standing to prosecute this case. Not only has this assertion been implicitly rejected by the Supreme Court in reapportionment opinions—in ruling on the merits of claims of malapportionment brought by groups of citizens [3]—but the Court has expressly held that an organization may assert the rights of its members.[4] This court has an equally lengthy and consistent line of authority in support of the same proposition.[5] Magically this precedent is waived aside with the stated argument that no evidence is adduced to show the members of the Ripon Society are not capable of enforcing their own rights. No such inquiry is necessary or has ever been required to support the limited *jus tertii* standing of an organization in favor of its members. The issue of associational standing is far removed from the normal difficulties of *jus tertii* standing because the association *is* the class of injured parties, as in a class action. The reams and reams of administrative appeals brought by groups of citizens in support of the rights of members is further proof of the extreme oddity of the court's suggestion. There is not one whit of doctrinal sup-

---

1. Since the division's opinion issued, one additional court has applied the one-person-one-vote principle to political parties, *Redfearn v. Delaware Republican State Comm.*, 393 F.Supp. 372 (D.Del.1975) (reaffirming its earlier decision and rejecting the alternative of invalidating state laws which adopted party decisions). On the other hand, the intervening decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) would compel the denial of attorneys' fees as requested by plaintiff-appellant.

2. In their brief on rehearing the Ripon Society has applied the 1976 Republican formula to both the 1972 and 1968–71 election results, and has calculated (1) deviations from the mean Republican vote per delegate, and (2) deviations from the mean population per delegate. For the 1972 election, its figures show the average deviation from the mean in both categories (1) and (2) to be 29.3%. For the 1968–71 elections, the average deviation in category (1) would be 36.7% and in category (2) 32.3%. These figures can usefully be compared to the average deviation from the mean population per Electoral College vote which, based on the 1970 census, is 22.2%.

More damningly, the Ripon brief shows that the uniform bonuses disserve both the goal of one Republican one vote, and the goal of one person one vote. Applied to the 1968–71 elec-

tions, the 1976 formula without uniform bonuses would produce an average deviation in category (1) of 32.1% (4.6% less than the average deviation with the uniform bonuses) and in category (2) of 25.8% (3.5% less). The Ripon brief does not isolate the effect of the proportional bonuses.

3. *E. g. Maryland Comm. for Fair Representation v. Tawes*, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964).

4. *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). *See also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

5. *See National Automatic Laundry & Cleaning Council v. Shultz*, 143 U.S.App.D.C. 274, 443 F.2d 689, 693–94 (1971) and cases cited. There are literally hundreds of administrative appeals largely involving communications and environmental policy in which standing for citizens' groups on behalf of their members is accepted as a matter of course. *E. g. Citizens Comm. to Save WEFM v. FCC*, 165 U.S.App. D.C. 185, 506 F.2d 246 (1974); *Wilderness Soc'y v. Morton*, 161 U.S.App.D.C. 446, 495 F.2d 1026 (1974), *rev'd on other grounds, Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

port for a holding that the Ripon Society lacks standing.

## II. *State Action*

The logic of our holding of state action in *Georgia* and *Bode* is unimpaired by the reasoning of the various opinions in this court or recent state action opinions in the Supreme Court. There is a clear "nexus" between state action in the process of selection of delegates [6] (and in the process of adopting the narrowing function performed by the selected delegates) *and* malapportionment of the delegates: malapportionment inheres in the nature of selection and in the ultimate choice by those selected as all seem to admit. Why else would the party malapportion? Of course, there is no state or federal law which requires the malapportionment but neither was there any state law requiring racial discrimination in *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). But in both cases the state affirmatively adopts the discrimination by otherwise "neutral" actions. And, of course, the Court in *Jackson* explicitly cited previous holdings of state action in regard to party primaries as independent and distinct from its holding in regard to public utilities.[7]

The baffling suggestion is advanced that *Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) somehow bears on this issue. But *Cousins* holds only that a state may not interfere with the associational rights of national political parties, not that a state is prohibited from assisting such parties in the selection of delegates or adopting the party's performance of a narrowing function. In fact, the Court has recently held that a state has a compelling state interest in *enforcing* this narrowing process.[8] Furthermore, all this says nothing about the power of the federal government to regulate political parties, an issue left expressly open in *Cousins.* Feeble indeed is the argument that the state must have plenary power over an organization, no matter how much the state adopts the organization's functions, in order for the organization to constitute state action. *Compare Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

Nor may previous Supreme Court findings of state action be distinguished as involving racial discrimination for which a lesser quantity of state action is required. First, none of the cases expressly relied on this fact. Second, the Supreme Court refused to make the racial discrimination distinction in *Moose Lodge* and relied on the *Moose Lodge* "nexus" argument as the primary ground for decision in *Jackson.* Third,

---

6. Generally state law determines how delegates to national conventions are to be selected; when selection must occur; who is eligible to run for delegate; and who is eligible to vote. State law also fixes the obligations of delegates once selected. Delegate selection and Presidential preference primaries are state funded and state-run. And the nominees chosen by the delegates to major party conventions are universally afforded automatic ballot access. *See generally* Congressional Research Service, Nomination and Election of the President and Vice President of the United States 72–173 (1972); *Developments in the Law—Elections,* 88 Harv.L.Rev. 1111, 1121, 1151–1217 (1975).

 The minority on rehearing makes the startling assertion that it does not follow from the fact that state selection of delegates constitutes state action that the actions of the delegates so selected in the national convention constitute state action. This heroic concept would mean that organizations such as the New York port authority are not state action since they are not an organization of any local government and since the "mere fact" that they are formed by two constituent state governments is not sufficient to find state action. This absurdity was decisively rejected in *Howard University v. National Collegiate Athletic Association,* 166 U.S.App.D.C. 260, 510 F.2d 213 (1975) and authorities cited.

7. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352, 95 S.Ct. 449, 42 L.Ed.2d 378 (1974). The minority offers the suggestion that state action is not present merely because the state somehow "benefits" a private organization, a comment which is uncontroversial enough. Its relevance to the issue at hand, however, is questionable.

8. *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

these cases were as much "right to vote" cases as they were racial discrimination cases and as such formed part of the express doctrinal basis for *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The subject matter of *Reynolds* and the present litigation is territorial discrimination against the right to vote of certain citizens. *Reynolds* teaches that such discrimination is forbidden by the same constitutional structure that forbids racial discrimination against the right to vote of certain citizens.[9]

### III. *Justiciability*

The majority opinion of the division, following *Georgia* and *Bode,* held that *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) resolved the justiciability issue as a threshold matter and that further consideration of policies of justiciability must be integrated into a determination of the merits of the plaintiffs' claim. The majority on rehearing appears to adopt this approach. However, some members of the court suggest this analysis is mistaken both because the one-person-one-vote rule is not applicable to political parties (and hence cannot be a judicially manageable standard as it was in *Baker*) and because the

constituency of a national political party cannot be judicially defined. Neither argument withstands analysis.

First, the minority is simply wrong in asserting that a national political convention is a "nongovernmental" body to which the one-person-one-vote rule is not applicable. *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963)— involving a party primary—and *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969)—involving malapportionment of the *signature requirements* on nominating petitions—are conclusive authority that the one-person-one-vote principle applies to the nominating activities of political parties. Indeed, it would boggle the mind to hold that the Kansas City Junior College District performed "governmental" functions while the national convention of a major political party does not.[10] Prevailing doctrine does not require such an absurdity.

As the division majority clearly holds,[11] the proper definition of a party's constituency is nonjusticiable. What is justiciable is the following: once a party defines a constituency for itself, courts will require that the party not malapportion the members of that constituency so as to deprive some constituents of their right to vote.[12]

---

9. The minority on rehearing attempt to defuse the fairly obvious state action rationale presented by federal financing of most major party activities on the national level by referencing recent decisions holding that "mere receipt" of state funds does not constitute state action. But here we have more than that—we have complete and *exclusive* federal financing of the convention and partially exclusive financing of the contested elections of delegates (the matching funds system for presidential elections and a concomitant spending limit). It certainly stretches the imagination to declare that this sort of funding is analogous to federal and state grants to private universities. To return to the example of the New York port authority, the minority would hold that there is no state action "merely" because the states of New York and New Jersey finance the operation of the entity through fare setting arrangements. Such a potential holding does not commend itself to us.

10. *See Hadley v. Junior College Dist.,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

11. Majority opinion, supra, 173 U.S.App.D.C. at ⸺ n. 47, 525 F.2d at 583 n. 47, 173 U.S. App.D.C. ⸺ at n. 58, 525 F.2d 585 at n. 58.

12. The minority on rehearing fails to distinguish between the two lines of "right to vote" cases, one line represented by *Reynolds v. Sims* and the other by *Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). *Kramer* concerns constitutional limits on the definition of a constituency for a particular governmental entity; *Reynolds* largely concerns what follows after a definition of constituency is reached, *i. e.,* may the constituency be malapportioned. *Salyer v. Tulare Lake Basin Water Storage Dist.,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) was a holding based on the *Kramer* principles and only very tangentially on the *Reynolds* principles. Of course, the two principles are

## IV. *The Merits*

The approach of the majority on rehearing to the merits of the case is to "balance" the one-person-one-vote principle against the legitimate interests of national political parties, interests which are entitled to First Amendment recognition if not unqualified acceptance.[13] The method itself is not necessarily objectionable, but the reasoning by which the one-person-one-vote principle is trivialized and by which interests of the party are extended beyond their appropriate sphere surely is contrary to precedent.

The majority's central argument is that the national parties are so undemocratic already that enforcement of the right to an equal vote for all party constituents makes little sense. Why is not an opposite conclusion equally plausible and indeed convincing? The structure of state legislatures and for that matter the Congress may well be undemocratic in particulars, for example the committee structure, the caucus, the system of patronage distribution. But surely it does not follow that malapportionment of legislative districts is thereby sanctioned. The whole purpose of reapportionment is to give all voters an equal place at the democratic starting line. What thereafter occurs is but the natural workings of the democratic process in which temporary majorities make necessary political decisions. The whole drift

of reapportionment—the one-person-one-vote principle—is to prevent these temporary majorities ˙from entrenching themselves in a manner that prevents the natural working of the democratic process *in the future.* Reapportionment derives its immense constitutional legitimacy from its prevention of this entrenchment.

This is the main error of the court's way: it assumes that decisions of a temporary majority in the organization of the party and the use of the party's political power are no different from entrenchment of the temporary majority in the very process of political choice. The court then leaps to the improbable conclusion that malapportionment of political parties either does not violate the one-person-one-vote principle or is outside the one-person-one-vote principle. But as is argued as persuasively as I know how in the majority opinion for the division,[14] an equal position at the democratic starting line preventing entrenchment of temporary majorities is distinct from the necessary actions of temporary majorities resulting from the operation of the political process. Moreover, equality at the starting line is just as important, if not more important, in the convention context than in the general election context, since for the great mass of voters their choice has already been determined by the convention's decision.[15]

closely interwoven and it may be unprofitable to distinguish them in any other context than national conventions of major parties. But the point of the distinction is important: it does not follow from the fact that a constituency of a state organization does not encompass all eligible or registered voters that malapportionment of the constituency that does exist is constitutionally appropriate.

13. *See* the discussion on 173 U.S.App.D.C. ——, ——–——, 525 F.2d 574, 581–582, the majority opinion of the division. The court in its discussion of the First Amendment interests of the party apparently fails to recall that it is assuming for purposes of decision that the convention is state action. While this fact does not eliminate First Amendment concerns, as the majority opinion of the division clearly holds, it does place consideration of those claims in a vastly different light—in-

stead of the rights of the association being paramount, the rights of the members of the association become paramount and if distinct from the interests of the association, should prevail.

14. *See* 173 U.S.App.D.C. ——–——, 525 F.2d at 577–580, *supra.*

15. The majority on rehearing asserts that *Bode,* by accepting the electoral college as a deviation from strict one-person-one-vote standards, is a tacit admission that the one-person-one-vote is either not applicable or applicable in only a meaningless pale version. This assertion is contradicted by the express holding in *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) that the constitutional requirement of one representative from each state in the House—creating a malapportionment of sorts—does not justify any further malapportionment.

The justifications, if they may be so named, the court offers in support of the malapportionment of the Republican convention are the sort easily made and quickly forgotten. The justifications are adequately disposed of in the division opinion.[16] It is enough to add here that the party itself seems to admit quite openly that the purpose of the victory bonus and its consequent malapportionment is not, as the majority on rehearing would have it, as some sort of "reward" or as a measure of "probable success" in capturing a state's electoral college votes. Rather, the purpose is an ideological compromise designed to apportion power within the party by means of a territorial discrimination. The "reward" and "prediction of future success" rationales are completely subsidiary to this overriding purpose. This should be obvious at least from the fact that these rationales simply cannot explain the "uniform" victory bonus and do not convincingly explain the failure to include the results of more than one presidential election in determining the need for a reward or the probability of future success.

Generally the court seems to assume that if a malapportionment might be helpful in winning elections or aid in the organization or solidarity of the party, it is permissible. But this reasoning destroys the one-person-one-vote principle. All malapportionment may have some legitimate objective—in winning elections or in ensuring party national solidarity. The one-person-one-vote principle does not deny the existence of these legitimate objectives, but holds that stretching them to permit malapportionm..nt undercuts the legitimacy of a democratic political order and hence is an overbroad application of a legitimate state aim. The court by denying this result here is simply holding that the one-person-one-vote principle is not applicable to political parties, without directly arguing the point, under the guise of "balancing."[17]

This is true, since there is no malapportionment conceivable, including overt racial discrimination, which could not be justified on similar grounds.

Of course, the court intimates it would not tolerate overt racial discrimination (although it approves here a territorial discrimination which has largely the same effect). But why? Surely in some areas it would be rational indeed, unfortunately so, to exclude blacks or other minorities to ensure party victory or solidarity. If the court were to reach a different result in such a case, then it will be pure *ipse dixit*. And, after all, *Reynolds v. Sims* expressly extended the proscription of denial of the right to vote on the basis of racial discrimination to proscription of denial based on territorial discrimination.

Stripped of its rational exterior, I read the majority opinion on rehearing as telling us something of this sort:

The reapportionment decisions were intensely controversial and involved a radical extension of judicial power. We will not extend those decisions nor the philosophy of judicial power they embody even if logically compelled, absent either more public demand than we can perceive or clear guidance from the Supreme Court. We simply do not believe the principle of one-person-one-vote is sufficiently important to overcome these concerns of institutional competence and popular approval, which have always lain on the horizon of the reapportionment decisions and which counsel studied conservation of the power of judicial review.

This sort of judicial statesmanship is not so much wrong as insensitive to the principles of legitimacy that underlie a democratic state and to the horrendous anomalies that this decision produces—*e. g.*, that the Kansas City junior college district must be properly apportioned while the national convention of a major political party is not. The principle of

16. *See* 173 U.S.App.D.C. ———, 525 F.2d at 580–582, *supra*.

17. On this "balancing" of the party's First Amendment interests and of the one-person-one-vote principle, *see* note 13 *supra*.

**620**

legitimacy is this, repeated again and again in support of controversial but necessary public decisions: if you disagree with present public policy, run for office or vote to throw the rascals out. Go through the legitimate processes of democratic government—the "system"—and popular change will follow. But the court tells us this is naive ideology, fit for high school textbooks perhaps, but surely not as a constitutional command in the "real world." There "democracy" means the power of incumbency and the power obtained by controlling the process of political choice. Democracy, in short, means only what the politicians say it means. I do not believe that the Constitution harbors any such cynical view.[18]

18. Perhaps the ultimate irony of the court's opinion is that it renders largely meaningless much of what we recently said in *Buckley v. Valeo*, 519 F.2d 821 (1975). In *Buckley* this court, again sitting en banc, upheld the major provisions of the Federal Election Campaign Act of 1971, as amended by the Federal Election Campaign Act Amendments of 1974. The lynchpin of that decision, in my view, was our recognition of the compelling governmental interest in equalizing the influence of all voters. As we stated:

It would be strange indeed if, by extrapolation outward from the basic rights of indi-

viduals, the wealthy few could claim a constitutional guarantee to a stronger political voice than the unwealthy many because they are able to give and spend more money, and because the amounts they give and spend cannot be limited. *Id.* at 841. I find it equally strange that the court now finds that the right to associate freely enables the powerful few to claim a stronger voice than the unpowerful many. I cannot understand why an interest which only yesterday we termed compelling is today afforded so little weight in the scheme of constitutional values.